**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| EDGE CAPTURE L.L.C., and EDGE SPECIALISTS, L.L.C., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 09-CV-1521 |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., UBS AG, UBS FINANCIAL SERVICES INC., UBS SECURITIES, L.L.C., WOLVERINE TRADING, L.L.C., AND WOLVERINE EXECUTION SERVICES, L.L.C., | ) ) ) ) ) ) ) | Judge Charles R. Norgle, Sr.  Magistrate Judge Denlow |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO WOLVERINE TRADING, L.L.C. AND WOLVERINE EXECUTION
SERVICES, L.L.C.'S MOTION TO DISMISS THE AMENDED COMPLAINT (D.E. 107)**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

FACTS ........................................................................................................................... 1

I.     The System Claims are Directed to *Fully Automated*, *Low-Overhead Trading* Systems ....................................................................................................................... 2

II.    The Dependant System Claims Claim Faster and More Flexible Automated Trading Systems Through Strategic Segregation of Elements ........................... 5

ARGUMENT ................................................................................................................. 6

I.     The Patents Claim Patent-Eligible "Machines" and "Processes" That Are Directed To Inventive Implementations of Automated Trading, And Not Any Abstract Ideas ............................................................................................................................ 6

    A.    The Asserted System Claims Fall Under the § 101 Category of "Machines," And the Method Claims Fall Under the § 101 Category of "Processes" ................................................................................................. 6

        1.    The asserted system claims are "machines" ............................................... 6

        2.    The asserted method claims are "processes" ............................................. 7

    B.    The System Claims Do Not Fall Within The Three Exceptions To Patent-Eligibility ................................................................................................... 9

        1.    The system claims do not claim an abstract idea because the claimed elements are connected to *low-overhead* and *fully automated* trading systems ........................................................................ 9

        2.    The dependent system claims do not claim an abstract idea because they claim faster and more flexible automated trading systems through strategic *segregation* of system elements ................................... 12

        3.    The Board of Patent Appeals and Interference cases relied upon by Wolverine are inapposite ......................................................................... 12

    C.    For The Same Reasons, The Asserted Method Claims Do Not Fall Under Any Of The Three Exceptions To Patent-Eligibility ........................................... 13

II.    The Amended Complaint Sufficiently Pleads Direct Infringement Against Wolverine .......................................................................................................... 14

CONCLUSION .......................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
    98 F.3d 1563 (Fed. Cir. 1996) ........................................................................... 10

*Bilski v. Kappos*,
    130 S.Ct. 3218 (2010) ........................................................................... passim

*Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801(Fed. Cir. 2002) ........................................................................... 10

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ........................................................................... 6, 7, 8, 9

*Ex parte Birger*,
    Appeal 2009-6556, 2010 WL 2800803 (B.P.A.I. Jul. 13, 2010) ............................... 13

*Ex parte Caccavale*,
    Appeal 2009-6026, 2010 WL 2901727 (B.P.A.I. Jul. 23, 2010) ............................... 13

*Ex parte Choo*,
    Appeal 2009-6352, 2010 WL 2985362 (B.P.A.I. Jul. 28, 2010) ............................... 12

*Ex parte Dickerson*,
    Appeal 2009-1172, 2009 WL 2007184 (B.P.A.I. Jul. 9, 2009) ................................ 13

*Ex parte Elkins*,
    Appeal 2009-6190, 2010 WL 3017285 (B.P.A.I. Jul. 30, 2010) ............................... 12

*Ex parte Fellenstein*,
    Appeal 2009-6595, 2010 WL 2985341 (B.P.A.I. Jul. 27, 2010) ............................... 13

*Ex parte Johnson*,
    Appeal 2009-6718, 2010 WL 2998170 (B.P.A.I. Jul. 29, 2010) ............................... 12

*Ex parte Proudler*,
    Appeal 2009-6599, 2010 WL 2727840 (B.P.A.I. Jul. 8, 2010) ................................ 12

*Ex parte Wasynczuk*,
    Appeal 2008-1496, 2008 WL 2262377 (B.P.A.I. Jun. 2, 2008) ............................... 12

*Gottschalk v. Benson*,
    409 U.S. 63 (1972) ........................................................................... 10, 11, 12

*Harris Corp. v. IXYS Corp.*,
   114 F.3d 1149 (Fed. Cir. 1997) ............................................................... 10

*In re Bilski*,
   545 F.3d 943 (Fed. Cir. 2008) ........................................................... 10, 12

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005) ................................................................. 4

*O'Reilly v. Morse*,
   56 U.S. 62 (1853) ................................................................................... 11

*On Demand Machine Corp. v. Ingram Indus., Inc.*,
   442 F.3d 1331 (Fed. Cir. 2006) ............................................................... 10

*Parker v. Flook*,
   437 U.S. 584 (1978) ................................................................................ 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 10

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.*,
   346 F.3d 1057 (Fed. Cir. 2003) ................................................................. 6

**Statutes**

35 U.S.C. § 100 (b) ....................................................................................... 7

35 U.S.C. § 101 ................................................................................... passim

35 U.S.C. § 103 ............................................................................................ 3

35 U.S.C. § 282 ............................................................................................ 6

## INTRODUCTION

For eighteen months since this action was filed, Wolverine has repeatedly sought to have this case dismissed based on its argument that the patents asserted by Edge cover subject matter ineligible for patent protection.[1] Now that the Supreme Court has ruled in *Bilski v. Kappos*, 130 S.Ct. 3218 (2010), Wolverine's arguments have been unmasked. Under the appropriate analysis, there can be no dispute that the claims of the patents cover patent-eligible "machines" and "processes" in compliance with 35 U.S.C. § 101.

## FACTS

The inventors of the '629 and '833 patents were the first to invent, more than a decade ago, the novel and particular implementations of machines, and the cutting-edge use of those machines, claimed in the patents. The claimed machines are much more than off-the-shelf, general-purpose computers from Best Buy or Target. The inventors altered computer systems into low-overhead and strategic configurations, transforming the systems into fast, safe, and accurate automated trading systems.[2] Edge Specialists, as the exclusive licensee of the patents, exercises its patent rights by developing proprietary trading software, loading that software on low-overhead and uniquely-configured computer systems to provide rapid, automated derivatives trading, and maintaining those specially-implemented systems on behalf of its customers. Edge is a legitimate, practicing business with rights to enforce its intellectual property.

Edge, based on currently available information, has alleged infringement by Wolverine of **system claims** 1, 9, 14, 21 and 22 of the '629 patent and **system claims** 1, 7, 9, 15, and 21 of the '833 patent (hereinafter "the asserted system claims"). Edge also has asserted one independent **method claim** (claim 24

---

[1] This action has been pending for eighteen months, but has yet to progress beyond the Rule 12 stage. On March 5, 2010, in denying Wolverine's second motion to dismiss, the Court stayed the case until the Supreme Court reached a decision in *Bilski v. Kappos*, 130 S.Ct. 3218 (2010) (D.E. 92). The Supreme Court published its *Bilski* decision on June 28, 2010. The Court accordingly lifted the stay on July 1, 2010. (D.E. 101). Wolverine then filed – for a third time – its motion to dismiss. Because the arguments raised in Wolverine's instant motion are repetitive of its prior motions and briefings, Edge incorporates by reference the entirety of its past response briefs to Wolverine's respective motions to dismiss – *i.e.*, all of Edge's arguments made in Docket Entries 60, 66, and 86-87.

[2] Indeed, Wolverine took an interest in Edge's proprietary trading solutions and was given an early look at Edge's technology. Instead of working with Edge, however, Wolverine elected to practice Edge's patented technology without authorization. (*See* D.E. 74 at ¶ 131).

of the '833 patent) and one dependent method claim (claim 25 of the '833 patent) against Wolverine.[3] *See*

Decl. of Patrick G. Burns ("Burns Decl."), Ex. A.

## I.     The System Claims are Directed to *Fully Automated, Low-Overhead Trading* Systems.

The inventors of the patents recognized early-on that a need existed "in the art for an automated

trading system that rapidly responds to trade information transmitted from an exchange, yet is safe and

accurate." (*See* D.E. 1 at Ex. B at 2:17-20). The asserted system claims are directed to "automated trading

system[s]" that meet this need through: (1) **low-overhead designs**, that are (2) **configured to engage in

fully automated trading**.

First, the written descriptions of the patents-in-suit establish that the claimed "automated trading

system" inventions are implemented through **a low-overhead configuration** and are improvements over

prior art trading systems with high-overhead. In the specifications of the '629 and '833 patents, the inventors

state that prior art automated trading systems existed, but were **slow due to high-overhead designs**:

> Attempts have been made to implement trading systems that automate decision-making so that
> orders may be submitted with limited trader interaction. These systems have a number of
> drawbacks. For example, **user-friendly systems that automatically submit orders without
> trader interaction, while faster than a human trader, are believed to be relatively slow in
> terms of computer speed due to application and system design**.

(*Id.* at Ex. A at 1:65-67, 2:1-5. *See also id.* at Ex. B at 1:49-55) (emphasis added). According to the '629

patent specification, one of the reasons behind this slow operation was that "[t]he **overhead** associated with

the functions performed by the backend computer and the trader stations **reduce[d] the response speed of

automated trading**." (*Id.* at Ex. B at 2:8–11) (emphasis added).

To overcome the drawback of high overhead in the prior art, the preferred embodiments of the

---

[3] Edge has asserted the current claims against Wolverine based on information presently available to Edge, as set forth in paragraphs 90-105 of the Amended Complaint. (*See* D.E. 74). In addition, given the proprietary and confidential nature of Wolverine's infringing activities, Edge anticipates that discovery will show that additional system claims and/or method claims from each patent are, and have been, infringed by Wolverine. For the same reasons discussed here, the patents contain other claims, not yet asserted by Plaintiffs, that similarly claim patent eligible subject matter, and contain other inventive limitations that distinguish those claims from the prior art.

claimed "automated trading system" inventions are described as being specifically designed to provide "an automated trading system . . . that rapidly submits orders in response to trading information received from the exchange." (*Id.* at 2:28–31). The specification states that meaningful speed advantages would be gained if the trading system was "dedicated or substantially dedicated to performing automated trading operations, with **limited or minimized overhead** permitted for other tasks." (*Id.* at 6:1–3) (emphasis added). As explained in the written description of the '629 patent:

> [B]ackend computer 225 is dedicated or substantially dedicated to performing automated trading-related functions
>
> ***
>
> In this way, **backend computer 225 may perform automated trading functions with limited interruption or delays associated with other tasks** the backend computers (such as backend computer 220) may be requested to perform. **This increases the response speed for automated trading operations**.

(*Id.* at 8:1-3, 12-17) (emphasis added).[4]

Second, the claimed "automated trading system" inventions are limited to a trading system that is **configured to perform** *fully automated trading*. During prosecution of the patents, the inventors distinguished their claimed inventions from prior art trading systems that involved human intervention by arguing that the trading systems claimed in the patents were fully automated with no human intervention.

Specifically, during prosecution of the '833 patent, the examiner rejected the pending system claims under § 103 as being unpatentable over Rickard (U.S. Patent No. 6,016,483) in view of Garber (U.S. Patent No. 5,963,923). Burns Decl., Ex. B at EDGE0000784-789. In response, the inventors distinguished the pending claims from Rickard and Garber, which **involved human intervention**, by explaining that the claimed "automated trading systems" were **fully automated**:

> **Claims 1-23 are directed to an automated trading system**. As noted above, neither Rickard nor Garber relate to automated trading . . . . As discussed above, **trading disclosed in Rickard and Garber is done by a human trader**.

---

[4] The drawings in the patents-in-suit also illustrate both a preferred low-overhead embodiment and the low-overhead embodiment's system performance. (*See* D.E. 1, Ex. B, Figs. 3 and 6; Ex. A, Figs. 3 and 5).

*Id.* at EDGE0000802 (emphasis added). Finding the applicants' argument persuasive, the examiner cited the fully automated trading distinction as **one of the reasons justifying allowance**:

> The following is an examiner's statement of reasons for allowance: the closest prior art of record was Rickard and Garber . . . . **Rickard fails to disclose an *automated* trading system, as in claims 1-39, but relies upon human inputs** . . . . Garber does not make *automated* buy/sell decisions based on received prices and value calculations. Thus **Garber describes trading that involves human interaction, not automated trading**. Neither Rickard or Garber, in light of the claims relate to automated trading or suggest "decision logic using at least a portion of the received market price information and transaction value to generate a decision whether to submit a response to buy or sell the first traded item." Thus claims 1-39 are allowed over the applied prior art.

*Id.* at EDGE0001049 (italicized emphasis in original).[5]

Accordingly, as the specifications and file histories of both patents establish, the claimed and inventive "automated trading system[s]" asserted in this litigation are systems that are **fully automated and in low overhead configurations**. With respect to independent claim 1 of each patent, the portions of the "automated trading system" that are fully automated and in **low-overhead configurations** are those portions that include the elements following the "comprising" clauses, such as the "receiver interface," the "data reference logic" and "data structure," the "transaction value calculator," and the "output interface." With respect to dependent claims 21 and 22 of the '629 patent, and dependent claim 21 of the '833 patent, the **fully automated and low-overhead portion is at least the "backend computer"** because it contains the relevant automated trading elements (*i.e.,* the "receiver interface," the "data reference logic" or "transaction value calculator," the "decision logic," and the "output interface").

---

[5] The Rickard and Garber patents were also cited and considered by the examiner during prosecution of the '629 patent (the same examiner handled both prosecutions). (*See* D.E. 1, Ex. B, List of References Cited); *see also* Burns Decl., Ex. C at EDGE0000295. Moreover, during prosecution of the '833 patent, independent system claim 1 was "provisionally rejected on the ground of nonstatutory double patenting over claims . . . of copending Application No. 09/417,774 [the '629 patent.]" Burns Decl., Ex. B at EDGE0000831-32. To overcome this rejection, applicants filed a terminal disclaimer. *Id.* at EDGE0000850. The Rickard and Garber patents' failure to disclose fully automated trading thus applies with equal distinguishing force to the '629 patent. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) (interpreting claims consistently across patents sharing a common disclosure).

## II.    The Dependant System Claims Claim Faster and More Flexible Automated Trading Systems Through Strategic Segregation of Elements.

Claims 21 and 22 of the '629 patent are system claims that depend from claim 1. Claim 21 of the '833 patent is a system claim that depends from claim 1. The claimed automated trading systems in the dependent system claims are **narrower in scope and more specific in design and architecture** than the independent system claims of the patents.

Specifically, as recited in claims 21 and 22 of the '629 patent, and claim 21 of the '833 patent, the inventors innovatively **segregated the monitoring portion of the system from the trading portion**.[6] For example, dependent claim 22 of the '629 patent includes a "backend computer," a "trader station," and a particular and inventive segregated arrangement between the "backend computer" and "trader station." Similarly, dependent claim 21 of the '833 patent provides narrower and more specific designs, combinations, and architecture than the system defined in claim 1 of the '833 patent.

The inventors claimed these additional improvements to the placement of system elements because, as explained in the written description of the '629 patent, advantages relating to both efficiency and flexibility flow from the segregated design:

> Moreover, the total time delay in submitting an order to the exchange site 100 includes a component attributable the transmission delay or network lag in transmitting signals between the exchange site 100 and the trader site 200.
>
> ***
>
> **Significantly, the backend computer 225 may be remotely supported or controlled by a distant trader station 230, which permits the trader station 230 to be located virtually anywhere without adversely affecting the response time of the automated trading system**.

(D.E. 1 at Ex. B at 8:17–21, 29-33 (emphasis added)).

---

[6] The patents also include dependent claims that further define the system architecture to include **co-location of the trading portion of the automated trading system next to the exchange,** which is another, novel implementation of the claimed invention. (*See, e.g.,* D.E. 1 at Ex. A at claim 22, Ex. B at claim 26). Although these claims have not yet been asserted against Wolverine, they provide additional improvements to the placement of system elements and, accordingly, lend advantages relating to both efficiency and flexibility to the claimed automated trading systems. *See* Edge's discussion in Section II of the Facts of its response to Barclays'/UBS's renewed motion to dismiss.

5

**ARGUMENT**

I.      **The Patents Claim Patent-Eligible "Machines" and "Processes" That Are Directed To Inventive Implementations of Automated Trading, And Not Any Abstract Ideas.**

Wolverine continues to impermissibly seek a dismissal under Rule 12 on an affirmative defense that Wolverine has not plead. *See* 35 U.S.C. § 282. Wolverine bears a clear-and-convincing burden of proof on its § 101 challenge to the patentability of Edge's claims, because the patents are presumed valid. *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

Here, Edge's claims are patentable. Under 35 U.S.C. § 101, there are four **separate** categories of subject matter that are eligible for patenting: **processes**, **machines**, manufactures, and compositions of matter. *See Bilski*, 130 S.Ct. at 3225. As the U.S.P.T.O. has repeatedly instructed, whether a claim falls under one of § 101's four express and distinct categories of patent-eligible subject matter is the first step in determining whether an invention is patentable. *See* Burns Decl., Ex. D at 1-2, Ex. E at 43925. Accordingly, this brief first demonstrates that the asserted system claims fall under the § 101 category of "**machines**," and the asserted method claims fall under the § 101 category of "**processes**."

An invention that falls within one of these four categories is patent-eligible under § 101, as long as the invention is not a law of nature, physical phenomena, or abstract idea. *See Bilski*, 130 S.Ct. at 3225-26 (citation omitted). This principle is **equally true** for both "machine" claims and "process" claims. This brief next addresses how the asserted claims do not fall within the three exceptions to patent-eligibility.

A.      **The Asserted System Claims Fall Under the § 101 Category of "Machines," And the Method Claims Fall Under the § 101 Category of "Processes."**

1.      **The asserted system claims are "machines."**

The Supreme Court noted in *Bilski* that "[i]n patent law, as in all statutory construction, '[u]nless otherwise defined, 'words will be interpreted as taking their ordinary, contemporary, common meaning.'''" *Bilski*, 130 S.Ct. at 3226 (citing *Diamond v. Diehr*, 450 U.S. 175, 182 (1981)). While the definition of

"machine" was not addressed in *Bilski* because the claims-at-issue in that case were method claims, the Supreme Court previously addressed the term "machine" in *Diamond v. Diehr*. In *Diehr*, the Court stated that "'[t]he term machine includes **every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result**.'" 450 U.S. at 182, fn. 7 (emphasis added).

The asserted system claims fall within this definition and thus within the § 101 category of "machines." Independent claim 1 of the '629 patent and independent claim 1 of the '833 patent are directed to different and distinct **automated trading systems**. The inventive machine in claim 1 of the '629 patent incorporates "data reference logic" and a "data structure" to achieve the result of rapid trading. The inventive machine in claim 1 of the '833 patent includes something different, "a transaction value calculator," to achieve that result. Moreover, dependent claims 21 and 22 of the '629 patent, and dependent claim 21 of the '833 patent, include a "backend computer" and a segregated "trader station," all in furtherance of making the inventive machines more efficient and faster.

In sum, each system claim defines a different inventive machine, comprised of different device elements, and squarely meets the Supreme Court's definition of "machine" under § 101.

### 2.   The asserted method claims are "processes."

The asserted method claims fall under the § 101 category of "processes." With respect to the term "process," the Supreme Court in *Bilski* applied the definition of "process" found in § 100 (b) of the Patent Act: "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." *Bilski*, 130 S.Ct. at 3226-29.

Contrary to Wolverine's argument here, the *Bilski* Court **specifically rejected** the argument "that would require [the definitional terms 'process, art or method'] to be tied to a machine or to transform an article." *See id.* at 3226. In other words, nothing in the definition of the term "process" requires a machine or

transformation, and thus the Court rejected the machine-or-transformation test as the **sole test** for deciding whether a "process" claim is patent-eligible. *Id.* at 3226-27. In addition, the Court was unable to find "any argument that the 'ordinary, contemporary, common meaning' . . . of 'method' excludes business methods." *Id.* at 3228. Indeed, the Supreme Court concluded that business methods can constitute patentable "processes" under § 101 of the Patent Act. *Id.* at 3228-29.

Under the statutory definition of "process," the method claims asserted by Edge fall under the § 101 category of "processes." The asserted method claims (claims 24 and 25 of the '833 patent) are drafted in "method" format, and define a specific process of automated trading that implements the particular and inventive machines defined in the asserted system claims of the '833 patent.

**Wolverine improperly treats all claims in the Edge patents, whether claiming systems or methods, as if they were "process" claims**. The system claims are not "process" claims.[7] At the heart of Wolverine's motion is a conflation of two statutory terms — "machines" are simply different from "processes" under the Patent Act. As the Supreme Court explained, "machines" are clearly categorically different from "processes":

> **One may discover a new and useful improvement in the process** of tanning, dyeing, &c., irrespective of any particular form of machinery or mechanical device. **And another may invent a labor-saving machine** by which this operation or process may be performed, and **each may be entitled to his patent**.
>
> ***
>
> **Yet A could not have a patent for a machine, or B for a process**; but each would have a patent for the means or method of producing a certain result, or effect, and for the result or effect produced.

*Diehr*, 450 U.S. at 182, fn. 7 (citation omitted) (emphasis added). Here, as described above, the claims of the patents cover both patent-eligible machines, as well as patent-eligible processes. The asserted system claims

---

[7] Like its co-defendants, Wolverine also appears to take the nonsensical position that a patent that claims automating a process traditionally done by humans is *per se* unpatentable (*See, e.g.,* D.E. 108 at 8-9). Such an argument ignores the history of scientific advancement, as well as patentable subject matter. History is replete with examples of patentable machines that replaced human activities – inventive implementations of machines for performing functions that humans traditionally performed are patentable under § 101. In any event, as set forth above, the inventive implementations claimed in the patents-in-suit go well beyond simply automating human tasks. The claims are directed to machines that provide fast, accurate, and automated trading based on specific system architecture.

expressly cover machines that squarely meet the Supreme Court's definition of "machine" in *Diamond v. Diehr*. There is no merit to Wolverine's statement that "[t]he claims of both the '629 and '833 patents are directed only to methods." (D.E. 108 at 6). In no uncertain terms, the system claims are "**machine**" claims, while the asserted method claims are "**processes**."[8]

### B.     The System Claims Do Not Fall Within The Three Exceptions To Patent-Eligibility.

There are only three exceptions to the patent-eligibility of claims that fall under one of the § 101 categories of subject matter – (1) laws of nature, (2) physical phenomena, and (3) abstract ideas. *Bilski*, 130 S.Ct. at 3225-26 (citation omitted). "Congress took this permissive approach to ensure that ''ingenuity should receive a liberal encouragement.''" *Id.* at 3225 (citation omitted).

Wolverine does not argue that the asserted claims claim a law of nature or natural phenomenon. Rather, Wolverine argues that the system claims improperly claim an abstract idea. Contrary to Wolverine's wild accusations, the inventions do not attempt to claim the abstract idea of automated trading itself, nor do the inventions monopolize the use of computers to perform an abstract idea – whether the abstract idea is automated trading in general, automated trading of derivatives, or automated trading in accordance with specific algorithms.

### 1.     The system claims do not claim an abstract idea because the claimed elements are connected to *low-overhead* and *fully automated* trading systems.

The asserted system claims of the patents are directed to inventive and improved implementations of automated trading systems that do not preempt a general computer implementation of an abstract idea. Here, as described *supra* at pages 2-4, the written descriptions and file histories of the patents demonstrate that the preamble claim term "automated trading system," when properly construed, distinguishes the claimed inventions over the prior art of record, **which had high-overhead configurations or lacked full**

---

[8] Were the Court to decide that Edge's asserted **system** claims are "processes," rather than "machines," under § 101, the asserted system claims squarely meet the "machine" prong of the machine-or-transformation test, for the same reasons as discussed in this Brief.

**automated trading capabilities**. *See Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1153 (Fed. Cir. 1997) (declining to accept a construction that would ensnare the prior art of record). Thus, "automated trading system" should be construed to cover an **automated trading system** where the portion of the system engaged in **automated trading employs a low-overhead configuration**. Moreover, as discussed *supra* at pages 3-4, the file histories demonstrate that "automated trading system" describes a trading system that is designed to perform **fully automated trading, with no human intervention**.[9]

Properly construed, the asserted system claims, rather than claiming abstract ideas, are therefore directed to specific and concrete implementations of automated trading — that is, to specific, low-overhead configurations that perform fully automated trading, with no human intervention.[10]

The Supreme Court precedent cited by Wolverine does not compel a different conclusion, and in fact demonstrates that the asserted system claims do not claim an abstract idea. In *Gottschalk v. Benson*, for example, the claims at issue covered the use of a particular algorithm that converted binary-coded decimal numbers to pure binary numbers in such a way that it had the practical effect of preempting the mathematical algorithm itself. *See* 409 U.S. 63, 65 (1972). The *Benson* claims were framed so broadly as to cover all practical implementations of the claimed algorithm. *See id.* at 71-72. Unlike the claims in that case, however, the asserted system claims of the patents are directed to specific and concrete implementations, not all implementations of automated trading or the algorithms employed. The claims do not, therefore, preempt

---

[9] A preamble limits a claim when it recites a necessary and defining aspect of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343-44 (Fed. Cir. 2006). Moreover, whether a claim preamble is limiting depends on the facts of each case in light of the overall form of the claim, and the description of the invention in the specification and prosecution history. *See Applied Materials, Inc. v. Adv. Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996); *see also Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-9 (Fed. Cir. 2002).

[10] As previously argued by Edge (D.E. 60, 66, and 86-87), to appropriately consider patentability under § 101, the Court must first construe the claims, and thus this issue is properly raised at summary judgment after claim construction. *See In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) (en banc) (stating that claim construction is an important first step in a § 101 analysis). In order to construe the claims, this Court must look to the entire intrinsic record, including both the written description and file histories. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005) (*en banc*) (citation omitted).

an abstract idea.[11]

Moreover, the inventive implementations of the asserted system claims extend well beyond a mere post-solution activity related to an abstract idea. The inventive contributions of the asserted system claims go to the intrinsic nature of the inventive machines themselves and the cutting-edge methods limited to those machines. This fact distinguishes the asserted system claims from unpatentable claims that may not wholly pre-empt an abstract idea, but are still unpatentable under § 101 because the only innovation offered is an abstract idea. This principle was established in *Parker v. Flook*, 437 U.S. 584 (1978), when the Supreme Court held that "a new and presumably better method of calculating alarm limit values" was unpatentable, "not because it contains a mathematical algorithm as one component, but because once that algorithm is assumed to be within the prior art, the application, considered as a whole, contains no patentable invention." *Id.* at 594-95.[12] Like the exclusionary principle in *Benson*, the *Flook* principle does not apply here. The asserted system claims' inventive contributions to the art of automated trading in electronic exchange networks are not improvements to trading algorithms, mathematical formulas, or trading concepts, but rather are **inventive improvements to the physical design and architecture of the automated trading systems themselves**.

Finally, the asserted system claims are distinguishable from the *Bilski* claims. Unlike here, the applicant in *Bilski* attempted to patent the pure mental process and mathematical formula associated with the basic concept of hedging, and the claims were therefore unpatentable under § 101. *See Bilski*, 130 S.Ct. at 3229-30. The *Bilski* claims covered pure mental concepts, as the Supreme Court noted, and were entirely divorced from anything technical. "Applicants themselves admit that the language of claim 1 does not limit

---

[11] Edge's system claims are more akin to the claims in *O'Reilly v. Morse*, 56 U.S. 62, 84-86, 112 (1853), that were directed to specific embodiments of the electromagnetic telegraph that had support in the specification and thus were patent-eligible under § 101.

[12] *Flook* also stands for the proposition that the prohibition against patenting abstract ideas cannot be circumvented by limiting the use of an abstract idea to a particular field or by adding insignificant post-solution activity. *See Bilski*, 130 S.Ct. at 3230.

any process step to any specific machine or apparatus." *In re Bilski*, 545 F.3d at 962. Edge's asserted system claims are fundamentally different. Rather than focusing on pure mental concepts, Edge's inventive system claims are primarily focused on physical improvements to automated trading systems through, *inter alia*, a low-overhead design. *See supra* at pages 2-4.

> **2.    The dependent system claims do not claim an abstract idea because they claim faster and more flexible automated trading systems through strategic *segregation* of system elements.**

For the same reasons, the dependent system claims do not claim an abstract idea. In addition, the dependent system claims claim additional system improvements to increase speed and efficiency, and further distinguish their systems over the prior art, through the **strategic segregation of system elements**. *See supra* at page 5. These types of two-computer configurations are **concrete implementations**, and are thus patent-eligible subject matter. Such two-computer configurations have already been found patentable under § 101. *See, e.g., Ex parte Wasynczuk*, Appeal 2008-1496, 2008 WL 2262377, at *10 (B.P.A.I. Jun. 2, 2008) (Burns Decl., Ex. F); *see also* discussion *supra* at pages 10-12.

> **3.    The Board of Patent Appeals and Interference cases relied upon by Wolverine are inapposite.**

Wolverine relies upon several recently-issued cases from the B.P.A.I. to support its erroneous position that the asserted system claims attempt to claim merely software. (*See* D.E. 108 at 11-13). In the cases cited by Wolverine, the B.P.A.I. found that the claims at issue were broad enough to effectively cover **software in the abstract**. *See Ex parte Proudler*, Appeal 2009-6599, 2010 WL 2727840 (B.P.A.I. Jul. 8, 2010) (claims covered a pure software algorithm, however implemented, just like *Benson*). *See also Ex parte Elkins*, Appeal 2009-6190, 2010 WL 3017285 (B.P.A.I. Jul. 30, 2010) (claims related to data gathering and data components, and directed to a mathematical modeling functionality, not specific implementations); *Ex parte Johnson*, Appeal 2009-6718, 2010 WL 2998170 (B.P.A.I. Jul. 29, 2010) (claims directed to software *per se*); *Ex parte Choo*, Appeal 2009-6352, 2010 WL 2985362 (B.P.A.I. Jul.

28, 2010) (claims directed to data structures and software *per se*, not specific implementations); *Ex parte Fellenstein*, Appeal 2009-6595, 2010 WL 2985341 (B.P.A.I. Jul. 27, 2010) (claims recited signals *per se*, not specific implementations); *Ex parte Caccavale*, Appeal 2009-6026, 2010 WL 2901727 (B.P.A.I. Jul. 23, 2010) (claim directed to computations that were not "performed by the 'distributed processing units' or any other machine . . . ."); *Ex parte Birger*, Appeal 2009-6556, 2010 WL 2800803 (B.P.A.I. Jul. 13, 2010) (claims directed to software and data in the abstract, abstract intellectual processes, and abstract architecture, rather than specific implementations).

Edge's claims, on the other hand, **describe much more than software**. As discussed above, the asserted system claims are directed to particular and inventive **implementations of low-overhead automated trading systems with defined locations for physical elements of the system**.[13],[14]

## C. For The Same Reasons, The Asserted Method Claims Do Not Fall Under Any Of The Three Exceptions To Patent-Eligibility.

The asserted method claims do not claim an abstract idea for the very same reasons that the asserted system claims do not. Edge's only currently asserted method claims (claims 24 and 25 of the '833 patent) are **inherently tied to the particular, inventive machines** claimed by the asserted system claims of the '833 patent, and thus satisfy the machine-or-transformation test.[15] As described above for the asserted system claims, the asserted method claims do not claim an abstract idea, because they are **executed by**

---

[13] The inventive and specific low-overhead machines, along with the machines' inventive and strategic positioning, go to the heart of the invention. The Edge claims are directed to a specific implementation of automated trading in an electronic exchange system network, and the claims recite specific structure and elements that are tied to the functions of analyzing, decision-making, and submitting requests for market transaction. Thus, the claimed systems are tied to particular machines, and impose meaningful limits on claim scope that go well beyond insignificant extra-solution activity. *See, e.g., Ex parte Dickerson,* Appeal 2009-1172, 2009 WL 2007184, at *8 (B.P.A.I. Jul. 9, 2009) (holding patentable claims directed to or tied to a particular computer system) (Burns Decl, Ex. G).

[14] There is no *per se* bar under § 101 on computer-related inventions, or software. The Supreme Court expressly declared that it would be unwise to impose such a bar. *See Bilski*, 130 S.Ct. at 3227 ("[T]he machine-or-transformation test would create **uncertainty as to the patentability of software . . . and inventions based on linear programming, data compression, and the manipulation of data signals**.") (emphasis added).

[15] In addition, the method claims also meet the "transformation" prong by transforming data representing one thing into another state or thing. *See* D.E. 60, 66, and 86-87.

**inherently-claimed, particular machines and machine elements that improve the speed and response time of prior art automated trading methods through reduced or limited overhead**. In *Bilski*, the method claims were tethered to **no** machines at all. *Bilski*, 130 S.Ct. at 3224, 3231. In direct contrast, the asserted method claims of the patents-in-suit are implemented by and tethered to inherently-claimed, particular and inventive machines. (*See* D.E. 1 at Ex. A at claims 24 and 25). Thus, the asserted method claims are entirely free of the defect that afflicted the method claims in *Bilski*.[16]

## II. The Amended Complaint Sufficiently Pleads Direct Infringement Against Wolverine.

The Amended Complaint complies fully with the Court's order to file a more definite statement. As alleged, based on Edge's current knowledge of Wolverine's activities, the Amended Complaint (1) specifically describes Wolverine's infringing systems and provides specific examples of trades that evidence infringing activity in at least ¶¶ 94-105, and (2) asserts the specific claims of the patents-in-suit that are presently supported by currently available information in at least ¶¶ 127 and 133.

Wolverine dances around this fact by mischaracterizing a statement made by Edge in its prior briefing. (*See* D.E. 108 at 13-14). But Wolverine well knows that it is its own use of particular automated trading systems that rapidly respond to desirable trading opportunities for options by submitting requests for market transactions that stands accused of infringement. Indeed, Edge set forth in the Amended Complaint

---

[16] Moreover, the factors provided in the U.S.P.T.O's post-*Bilski* Interim Examination Guidelines also show that Edge's asserted method claims do not claim an abstract idea. *See* Burns Decl., Ex. E. For instance, "[w]here a machine or apparatus is recited or inherent in a patent claim," the U.S.P.T.O. considers the following factors:

(1) The particularity or generality of the elements of the machine or apparatus, *i.e.*, the degree to which the machine in the claim can be specifically identified (not any and all machines). **Incorporation of a particular machine or apparatus into the claimed method steps weighs toward eligibility**.

(2) **Whether the machine or apparatus implements the steps of the method. Integral use of a machine or apparatus to achieve performance of the method weighs toward eligibility**, as compared to where the machine or apparatus is merely an object on which the method operates, which weights against eligibility.

(3) **Whether its involvement is extra-solution activity or a field-of-use** . . . .

*Id.* at 43925 (emphasis added).

five specific, separate and actual transactions for options contracts that Wolverine entered into with CBOE account acronym GRF on January 27, 2009. (D.E. 74 at ¶ 96) (emphasis added). *See also* Burns Decl., Ex. H, O'Donnell Decl. The automated derivatives trading systems and methods expressly accused of infringement, as alleged in the Amended Complaint, are at least those systems that submitted the five orders for options contracts to the CBOE on January 27, 2009. *See also* Burns Decl., Ex. I, Buczynski Decl. Wolverine knows which of its trading systems and methods were used to execute the five transactions identified in ¶ 96 of the Amended Complaint.  It is disingenuous for Wolverine to claim otherwise.[17]

There is no doubt that the combination of the description of Wolverine's systems, the disclosure of specific trades, and the identity of the presently asserted claims provides Wolverine with enough specificity to defend itself. Wolverine has indeed put forth a full defense with respect to its § 101 defense. The Court ordered Edge to file a more definite statement that pleads with specificity the infringing activities. (*See* D.E. 72). Edge has done that. The Court should thus reject Wolverine's meritless argument.[18]

## CONCLUSION

For all the foregoing reasons, Edge asks this Court to deny Wolverine's motion to dismiss.

---

[17] Wolverine's analysis of the patentability of the asserted claims under 35 U.S.C. § 101, albeit incorrect, shows that Wolverine understands the type of trading activity to which the asserted claims are directed. Wolverine's own words belie its claim of confusion – "[t]he claims of both the '629 and '833 patents are directed . . . [to] automatically determining whether a 'first traded item' (such as a stock option) is desirably priced, and then automatically submitting an order for the item if a desirable price is identified." (D.E. 108 at 6).

[18] Wolverine's complaint about Edge's supposed "'need-discovery allegations'" is equally meritless. Edge has never contended that it needs discovery in order to develop a factual foundation for bringing this lawsuit.

Dated: October 4, 2010           Respectfully submitted,

By:   /s/Patrick G. Burns                          

      Ronald J. Schutz (*pro hac vice*)
      Munir R. Meghjee (*pro hac vice*)
      Sang Young A. Brodie (*pro hac vice*)
      Glenna L. Gilbert (ARDC No. 6286244)
      **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
      2800 LaSalle Plaza
      800 LaSalle Avenue
      Minneapolis, Minnesota 55402
      Phone: (612) 349-8500
      Facsimile: (612) 339-4181

      -and-

      Patrick G. Burns (ARDC No. 3122589)
      Jeana R. Lervick (ARDC No. 6277887)
      Gavin James O'Keefe (ARDC No. 6293489)
      GREER, BURNS & CRAIN, LTD.
      300 South Wacker Drive
      Suite 2500
      Chicago, Illinois 60606
      Phone: (312) 360-0080
      Facsimile: (312) 360-9315

      **ATTORNEYS FOR PLAINTIFFS EDGE CAPTURE L.L.C. AND EDGE SPECIALISTS, L.L.C.**

16

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on October 4, 2010, he caused a true and correct copy of **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WOLVERINE TRADING, L.L.C. AND WOLVERINE EXECUTION SERVICES, L.L.C.'S MOTION TO DISMISS THE AMENDED COMPLAINT (D.E. 107)** to be served on the below parties through the CM/ECF system:

Jeffrey G. Randall            jeffrandall@paulhastings.com

Allan M. Soobert             allansoobert@paulhastings.com

Emily Newhouse Dillingham    emilydillingham@paulhastings.com

Robert W. Unikel             robert.unikel@kayescholer.com

Deanna L. Keysor             deanna.keysor@kayescholer.com

Michelle Kristina Marek       michelle.marek@kayescholer.com




            /s/Patrick G. Burns_____
            Patrick G. Burns