**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Edge Capture L.L.C. and Edge Specialists, L.L.C, <br><br> Plaintiffs, <br> v. <br><br> Barclays Bank PLC; Barclays Capital Inc.; UBS AG; UBS Financial Services, Inc.; UBS Securities, L.L.C.; Wolverine Trading L.L.C.; and Wolverine Execution Services L.L.C., <br><br> Defendants. | Case No. 09-cv-1521 <br><br> Judge Charles R. Norgle, Sr. <br> Magistrate Judge Morton Denlow |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS
WOLVERINE TRADING L.L.C. AND WOLVERINE EXECUTION
SERVICES L.L.C.'S MOTION TO DISMISS AMENDED COMPLAINT**

Edge's Opposition makes clear that Wolverine was wrong on one point in its opening brief: Edge's '833 and '629 Patent claims do not attempt to claim *one* abstract idea—mere automation of derivatives trading; rather, those claims attempt to claim *two* abstract ideas, so as to preclude the maximum amount of potential electronic derivatives trading activity:

**Abstract Idea #1** - a computer can execute a pre-defined action/formula faster than a human;

**Abstract Idea #2** - a computer running only one program (what Edge calls "low overhead") is faster than a computer running multiple programs at the same time.

It does not require a Ph.D. in electrical engineering or vast experience in derivatives trading to appreciate that these ideas amount to little more than computer-age common sense and that permitting Edge to assert a patent monopoly over these common-sense ideas would foreclose virtually all electronic derivatives trading.[1]

Of course, if the '833 or '629 Patent claims had called out newly-created hardware or uniquely-designed machines to implement these abstract ideas, then there might not be an issue as to whether the claims were directed to patentable subject matter under 35 U.S.C. § 101. But Edge's claims do not include or identify such inventive apparatuses. Rather, a review of the '833 and '629 Patents (which were attached as exhibits to Edge's Amended Complaint) establishes that the claims reference only the most basic and generic computer equipment ("back-end computer," "trader station," "receiver interface," "output interface"); equipment that indisputably includes the type of general purpose computer equipment that can be purchased online from Dell. As the '833 and '629 Patents, themselves, state: "In a typical set-up, trading information received from the exchange is processed by <u>general purpose backend computer equipment</u>. . . .

---

[1] Each of us regularly turns our computer into a "low overhead" machine, as Edge uses that term, when we, for example, shut down our word processing program so that our internet browser will run more quickly. Little do we all realize when taking this self-evident step that, according to Edge, we are creating "inventive machines" with "low-overhead designs." (Opp. at 9-10.)

1

The receiver interface and the output interface <u>may be formed by common equipment and/or data ports.</u>" ('629 Patent at 2:54-58, 15:19-21; *see also* '833 Patent at 7:36-38; 19:35-36).

Post-*Bilski v. Kappos*, __ U.S. __, 130 S. Ct. 3218 (2010), the law is clear (and Edge's Opposition concedes) that when a patentee attempts to claim a system or a method that encompasses an "abstract idea," merely specifying the use of a general purpose computer as part of the system or method does not magically convert the claim from unpatentable to patentable. *See* Wolverine Memorandum in Support of Motion to Dismiss Amended Complaint ("Wolve. Mem.") at 7-9, and cases cited therein. Indeed, the very judicial decisions and PTO guidelines cited *by Edge* specifically establish that regardless of whether a claim is directed to a "machine" or a "process," to a "system" or a "method," the claim fails the threshold legal test for patentable subject-matter if it recites only generic, non-limiting hardware and components (such as "a computer," "a network," or "an interface"):

> A claim that includes terms that imply that the invention is directed to a product, for instance by reciting "a machine comprising . . . .", but fails to include tangible limitations in accordance with its broadest reasonable interpretation is not limited to a practical application, but rather wholly embraces or encompasses the concept upon which the invention is based. This is impermissible as such claim coverage would extend to every way of applying the abstract idea, law of nature or natural phenomenon. [Edge Opp., Burns Decl. Ex. D, at 5.][2]

Ultimately, Edge's Opposition does not (because it cannot) dispute (a) that the threshold issue as to whether Edge's patents claim unpatentable subject-matter under Section 101 is one of law that can be resolved by motion to dismiss, *see Ultramercial, LLC v. Hulu, LLC*, 2010 WL 3360098, at *1 (C.D. Cal. Aug. 13, 2010) (granting 12(b)(6) motion to dismiss on grounds that

---

[2] To be clear, the Edge "inventors" are not claiming to have invented a customized computer with unique parts and specialized hardware. Instead, according to Edge's Opposition, the Edge "inventors" simply claim to have devised the ideas of (a) loading a general purpose computer with automated trading software/algorithms *that Edge concedes already existed*; and (b) loading the computer with few other programs, thereby making the computer "low overhead." If the act of loading pre-existing software onto a Dell desktop can be deemed "patentable" simply because it involves the use of a computer, then there truly is no limit to what can be patented, and thus monopolized.

patent claims calling out use of "computer memory," "a facilitator," and "the Internet" failed to cover patentable-subject matter)[3]; and (b) that *every* judicial and Patent Office ("PTO") decision issued since the Supreme Court's *Bilski* ruling has rejected claims like Edge's—claims directed toward "systems" and "processes" that do nothing more than specify the use of a computer (or other generic equipment) to perform known mental and/or manual actions.[4] In fact, Edge's Opposition fails to cite even a single post-*Bilski* judicial or PTO decision upholding the patentability of claims analogous to those now asserted against Wolverine. The reason for this is simple: no such decisions exist.

Finally, separate and apart from its failure to establish the patentability of Edge's patent claims, Edge's Opposition offers no legally cognizable explanation as to how the Amended Complaint actually satisfies this Court's October 20, 2009 directive to file a more definite statement due to the "vague and ambiguous nature" of the infringement allegations contained in Edge's initial Complaint. (Order of Oct. 20, 2009 at 1.) Edge concedes that the only substantive allegation added to the Amended Complaint as to Wolverine's allegedly infringing activities is found in Paragraph 96, where Edge alleges that on January 27, 2009, Wolverine entered into five

---

[3] Though Edge suggests, in passing, that Wolverine's motion "impermissibly seek[s] dismissal under Rule 12 on an affirmative defense that Wolverine has not plead" (Edge Op. at 6), the law of this Circuit is clear: where the merits of an affirmative defense (such as invalidity due to unpatentable subject matter) can be determined from the complaint and its attachments, it is proper for the court to consider the affirmative defense on a Rule 12(b)(6) motion. *See Stanley v. Hollingsworth*, 2009 WL 102125, at *3 (7th Cir. Jan. 15, 2009); *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) ("[W]hen an affirmative defense is disclosed in the complaint, it provides a proper basis for a Rule 12(b)(6) motion.").

[4] *See* Wolve. Mem. at 11-13, summarizing post-*Bilski* rejections of "system" and "process" claims; *see also Ultramercial*, 2010 WL 3360098, at *3-7; *Graff/Ross Holdings, LLP v. Federal Home Loan Mortgage Corp.*, Slip. Op. at 7-15 (D.D.C. Aug. 27, 2010) (Ex. B hereto); *Ex parte Moore,* 2010 WL 3903327, at *8-9 (BPAI Sept. 28, 2010); *Ex parte Dettinger*, 2010 WL 3768179, at *4-5 (BPAI Sept. 24, 2010); *Ex parte Kelkar*, 2010 WL 3768175, at *2-4 (BPAI Sept. 24, 2010); *Ex parte Burkhart*, 2010 WL 3738331, at *4 (BPAI Sept. 22, 2010); *Ex parte Hong*, 2010 WL 3719143, at *7 (BPAI Sept. 21, 2010); *Ex parte Fatula*, 2010 WL 3523836, at *2-4 (BPAI Sept. 8, 2010); *Ex parte Russo*, 2010 WL 3441058, at *3 (BPAI Aug. 30, 2010); *Ex parte Estrada*, 2010 WL 3389278, at *2-3 (BPAI Aug. 26, 2010); *Ex parte Christian*, 2010 WL 3389297, at *2-3 (BPAI Aug. 23, 2010); *Ex parte Ramanujam*, 2010 WL 3214559 (BPAI Aug. 12, 2010); *Ex parte Huer*, 2010 WL 3072973, at *5-6 (BPAI Aug. 4, 2010).

options transactions that, because of their speed, must have been made electronically (rather than via human action). Yet, this Court already flatly rejected Edge's attempt in the original Complaint to accuse electronic trading generally of infringement: Edge's current attempt to accuse Wolverine's electronic, "market making" trading activities by referencing 5 individual electronic trades is no better than Edge's already-rejected attempt to accuse Wolverine's electronic trading activities by referencing Wolverine's electronic "market making" activities as a whole. (*See* Order of Oct. 20, 2009 at 1; Compl. at ¶¶ 37-45; Edge Opp. at 27-29.)

I. **EDGE'S OPPOSITION ARGUMENTS DO NOT UNDERMINE THE LEGAL CONCLUSION THAT THE '633 AND '829 PATENT CLAIMS COVER ONLY UNPATENTABLE "ABSTRACT IDEAS"**

Boiled down, Edge's Opposition offers only three arguments as to why the Court purportedly should find that the '633 and '829 Patents cover patentable subject matter. It appears that these three arguments were chosen more for their ability to confuse than for their substantive merit and legal support. Indeed, careful evaluation of Edge's arguments—and the complete lack of judicial and PTO authority supporting them—reveals that Edge's arguments are little more than rhetorical "red herrings," advanced in the apparent hope that the Court will become so flummoxed that it will throw up its hands and defer consideration of the Section 101 patentability issue. Wolverine is confident that the Court will not be so easily fooled.

**Edge Argument #1 - Edge asserts that because certain of Edge's asserted claims are directed to an "automated trading *system*," those claims must be deemed "machines" and are automatically considered patentable subject matter. (Edge Opp. at 6-9)[5]**

---

[5] It must be noted that Edge Argument #1 *does not apply* to asserted claims 24 and 25 of the '833 Patent, which Edge concedes are "method claims." (Edge Opp. at 1-2.) Further, to the extent that Edge has made crystal-clear that it fully intends to accuse Wolverine of infringing '633 and/or '829 Patent claims beyond those identified in the Amended Complaint if Edge survives this motion to dismiss, then the Court must take notice of the fact that '629 claims 27-46 and '833 claims 24-39 are explicitly directed to an "automated trading method," and, accordingly, are indisputably excluded from Edge Argument #1.

4

Edge's own cited authorities firmly establish that Edge Argument #1 is *flat wrong*. As the PTO Interim Guidelines cited by Edge (p. 14, n.16) specifically state, to establish patentable subject matter, a patentee must show, first, that a claim is directed to either a process or a machine, *and, second,* that the claim is not directed to an "abstract idea":

> There are two criteria for determining subject matter eligibility *and both must be satisfied*. The claimed invention (1) must be directed to one of the four statutory categories [process, machine, manufacture or composition of matter], and (2) must not be wholly directed to subject matter encompassing a judicially recognized exception [including abstract ideas, mental processes or substantially all practical uses of a law of nature.] [Edge Opp., Burns Decl. Ex. D, at 3 (underline in original) (italics added).]

Edge Argument #1 would have the Court focus only on the first requirement of patentability (by labeling the asserted "system" claims as "machines") and wholly ignore the second requirement by refusing to determine whether the "system"/"machine" claims are directed to abstract ideas.

The authorities are uniformly clear (and, at p. 9, Edge's Opposition ultimately concedes) that merely calling a claim a "system" or a "machine" does not immunize the claim from abstract idea analysis. Indeed, the same Examination Guidlines cited by Edge specifically warn against "system"/"machine" claims (like Edge's) that attempt, through identification of only generic hardware/technical elements, to gain control over an abstract concept:

> [A] claim that is directed to a machine ("What is claimed is a machine that operates in accordance with F=ma") and includes no tangible structural elements under the broadest reasonable interpretations, covers the operating principle based on a mathematical relationship with no limits on claim scope. . . . The claim would wholly embrace the mathematical concept of F=ma and would not be eligible subject matter. [Edge Opp., Burns Decl. Ex. D, at 6.][6]

Ultimately, courts and the PTO routinely reject "system" claims like Edge's that reference only general purpose computer elements and that fail to impose any meaningful limits

---

[6] This is the only approach that makes legal or logical sense. Consider a method claim such as, "A method for calculating a number comprising adding one number to another number to arrive at a sum." This claim indisputably would violate the prohibition on patenting an abstract idea: addition. Yet, Edge Argument #1 would permit a party seeking to patent this basic idea to escape patentable subject-matter scrutiny simply by rewriting the claim in "system" form: "A calculation system comprising a machine used to add one number to another number to arrive at a sum." Such a result would be nonsensical.

5

on the use of the recited abstract ideas/steps. For example, when invalidating "system" claims similar to Edge's, the Court in *Every Penny Counts, Inc. v. Bank of America Corp.*, 2009 U.S. Dist. LEXIS 53626 (M.D. Fla. Mar. 27, 2009), explained:

> [Plaintiff] argues that the 191 patent does not claim a process, but rather claims a system, which is analogous to a machine. Thus, according to [Plaintiff], *Bilski* does not apply in the first instance . . . .
>
> Simply because the process at issue requires machines or computers to work, however, does not mean that the process or system is a machine. The "system" described by the 191 patent "has no substantial practical application except in connection with" computers, cash registers, and networks, but it is not comprised of those devices. The 191 patent is a process not a machine.
>
> *Bilski* emphasized that the use of a machine in the process in question was not particularly relevant in determining whether that process was patent-eligible. Rather, a Court must examine whether "the use of a specific machine . . . impose[s] meaningful limits on the claim's scope" and whether "involvement of the machine in the claimed process [is] merely . . . insignificant extra-solution activity." In the process claimed by the 191 patent, a mathematical algorithm uses machines of data input and data output to perform the required calculations. Those machines do not, however, impose any limit on the process itself. The involvement of the machine in the process is insignificant extra-solution activity, and thus the process is not patentable under § 101. [*Id.* at *6 (*quoting Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972) and *Bilski*, 545 F.3d at 961-62, respectively).]

Similarly, in the very-recent *Ex parte Moore*, 2010 WL 3903327, at *8-9 (BPAI Sept. 28, 2010), the PTO rejected claims for "a method *and system* for receiving facultative case summary information over a network as part of a reinsurance transaction," stating:

> It is arguable that the term "network" in the preamble is "necessary to give life, meaning and vitality" to the claim. At best, it implies the use of a general purpose computer. Given that the body of the claim provides no further insight into the workings of the computer or "network," the term network suggests at best a nominal use of a general purpose computer. . . . A nominal recitation of a general purpose computer is not an express recitation to a *particular* machine. Thus, we do not find that the claimed process is tied to a particular machine.
>
> Also, the term "network" in the preamble implies operating the subsequently-recited steps in a "computer-implemented" environment, e.g. in the computer field. "*Flook* stands for the proposition that the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" *Bilski*, 130 S. Ct. 3218, 3230. . . . The term "network," suggesting at best a nominal use of a general purpose computer, imposes no meaningful limits on the scope of the claim apart from describing a

6

> field in which to conduct the process. A field-of-use limitation is insufficient to render an otherwise patent-ineligible process patent-eligible. [*Id.* (citations omitted).]

*See also CyberSource Corp. v. Retail Decisions, Inc.,* No. 04-3268, 2009 WL 815448, at *5-10 (N.D. Cal. Mar. 27, 2009) (invalidating under *Bilski* patent claims directed to "a method *and system* for detecting fraud in a credit card transaction"); *DealerTrack, Inc. v. Huber*, No. 06-2335, 2009 WL 2020761, at *3-4 (C.D. Cal. July 7, 2009) (rejecting as invalid claims purportedly drawn to a machine that are "nothing more than a general purpose computer that has been programmed in some unspecified manner"); *Ex parte Dettinger*, 2010 WL 3768179, at *4-5 (BPAI Sept. 24, 2010) ; *Ex parte Kelkar*, 2010 WL 3768175, at *2-4 (BPAI Sept. 24, 2010) ; *Ex parte Burkhart*, 2010 WL 3738331, at *4 (BPAI Sept. 22, 2010); *Ex parte Fatula*, 2010 WL 3523836, at *2-4 (BPAI Sept. 8, 2010) ; *Ex parte Ramanujam*, 2010 WL 3214559, at *1-4 (BPAI Aug. 12, 2010); *Ex parte Russo*, 2010 WL 3441058, at *3 (BPAI Aug. 30, 2010); *Ex parte Christian*, 2010 WL 3389297, at *2-3 (BPAI Aug. 23, 2010); *Ex parte Atkin*, 2009 WL 247868, at *8 (BPAI Jan. 30, 2009); *In re Comiskey*, 2009 U.S. App. LEXIS 913, at *35 (Fed. Cir. Jan. 13, 2009); *Ex parte Greene*, 2009 WL 1134839, at *7 (BPAI Apr. 24, 2009).

Edge can not dispute that its asserted "system" claims ('629 claims 1, 9, 14, 21 and 22 and '833 claims 1, 7, 9, 15 and 21) call out the identical steps/actions as the patents' "method" claims; and Edge can not dispute that *all of its claims* (system and method) call out, at most, use of generic, off-the-shelf "back end computers" and "trader stations" to perform well-known derivatives trading steps. *See* attached Ex. A.[7] Accordingly, Edge Argument #1 is nothing more

---

[7] There is no dispute that the *actions* performed as part of Edge's systems/methods are not new, as Edge's original combined Opposition brief, itself, stated (1) "[T]he inventors do not claim to be the first to have invented automated trading systems. They acknowledge in the 'Description of the Related Art' that automated trading systems already existed at the time of invention, although they were too slow[.]" (Edge Combined Opp. at 13); and (2) "While the inventors appreciated that their automated trading systems would employ algorithms to perform certain trading functions, those algorithms were not at the heart of the inventions and were, in fact, widely used in the prior art." (Edge Combined Opp. at 22.)

than an attempt at misdirection: Edge cannot escape the prohibitions against patenting abstract ideas simply by substituting the word "system" for the word "method" in half of its claims.

**Edge Argument #2** - **Edge suggests that because its asserted patent claims specify an "automated" trading system/method, those claims must be understood to mean, and must be limited to, a "fully automatic" and "low overhead" trading system/method. (Edge Opp. at 2-5, 9-14.)**

Edge devotes nearly 10 pages of its Opposition to this curious argument—curious because Edge, the patentee, seems to be arguing that its own patent claims should be limited to specific embodiments described in the '833 and '629 Patent specifications; and curious because Edge seems be suggesting that all of its claims are limited to "low overhead" systems/methods, *even though the words "low overhead" never actually appear in the claims*. Yet, even if the Court and Wolverine accept Edge's suggestion as true (purely for purposes of this motion), as to the patentable subject matter issue now before the Court, the reader of the lengthy Edge Argument #2 cannot help but ask, "So what?" Generically and broadly limiting the '629 and '833 Patent claims to "low overhead" computers does absolutely nothing to enable those claims to satisfy the principally-instructive "machine-or-transformation" test or to establish that the claims are not directed to abstract ideas. In fact, as stated at the outset of this Reply, Edge's Argument #2 simply makes clear that Edge is trying to gain patent protection over *two* abstract ideas in the derivatives trading space (full automation and use of low overhead computers), rather than merely *one* abstract idea (full automation, as Wolverine had previously assumed, given that, again, the terms "low overhead" aren't actually included in the asserted claims).

Because the '629 and '833 Patent claims do not recite any specially-designed or uniquely-configured hardware—requiring, instead, only the use of general purpose computers that can be purchased from any Target store and loaded with automated derivatives trading software (and few other programs so as to make the general purpose computer "low overhead"),

8

those claims fail the "machine-or-transformation" test and clearly attempt to monopolize the abstract ideas of automation and use of low overhead equipment in the derivatives trading field. Yet, the *Bilski* Court made clear that "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the [idea] to a particular technological environment." 130 S. Ct. at 3230. And, post-*Bilski*, the courts and the PTO consistently have rejected claims like Edge's that are directed merely to the use of general purpose computers to perform previously-known actions—particularly an action as basic as, "Load fewer programs on a computer so the computer will run faster." *See* authorities cited in Footnote 4, *supra*.[8]

As succinctly, and very recently, described by a court when rejecting patent claims *extremely similar* to Edge's in *Graff/Ross Holdings, LLP v. Federal Home Loan Mortgage Corp.*, Slip Op. (D.D.C. Aug. 27, 2010) (Ex. B hereto):

> [I]ndependent claim 101 is not drawn to patentable subject matter because it recites nothing more than an abstract idea on a general purpose computer - i.e., computing a price for the sale of a fixed income asset and generating a financial output. The claimed steps only require the following: (1) receiving input data entered by a keyboard; (2) providing any computer controlled by a processor to receive the input and send outputs to a monitor or printer; (3) using the computer processor to calculate a price for at least one component of a fixed income asset; and (4) generating financial analysis that includes that price. * * *
> [T]he recited machines provide no meaningful limitation and the claim is "so abstract and sweeping . . . [that it could] be performed through any existing or future-devised machinery, or even without an apparatus." *See* Interim Guidance, 75 Fed. Reg. 43,925. As *Bilski* instructs, an abstract idea does not become patentable simply because the claim involves a field of use limitation. 130 S. Ct. at 3231. Here, attempting to limit an

---

[8] Edge attempts to dismiss the post-*Bilski* BPAI decisions cited in Wolverine's Motion by mischaracterizing those decisions as involving claims directed to "mere[] software *in the abstract*." (Edge Opp. at 12-13.) This is simply untrue. The rejected claims in *Ex parte Proudler*, 2010 WL 2727840 (BPAI July 8, 2010), for example, included a "computer apparatus" and "hardware" which were programmed to control data processing. The rejected claims in *Ex parte Elkins*, 2010 WL 3017285 (BPAI July 30, 2010), included system claims directed to a "processor" that was programmed to perform certain modeling functions. The rejected claims in *Ex parte Choo*, 2010 WL 2985362 (BPAI July 28, 2010), were directed to a "computer system" programmed to perform security measures. Finally, the rejected claims in *Ex parte Caccavale*, 2010 WL 2901727 (BPAI July 23, 2010), were directed to a "system" with "distributed processing units" further identified as internet servers. In short, these decisions established that neither using the words "system" nor simply calling out use of a general purpose computer will save a claim in a claim from Section 101 invalidity.

abstract idea of computing a price for the sale of a fixed income asset to a general purpose computer - i.e., limiting it to a particular technological field - will not bestow patentability on the claim.

A mere eight weeks ago, the Court in *Ultramercial, LLC v. Hulu, LLC*, 2010 WL 3360098, at *1 (C.D. Cal. Aug. 13, 2010), granted a 12(b)(6) motion to dismiss a patent infringement complaint for lack of patentable subject matter, notwithstanding the patentee's argument that its claims were limited/tied to the use of a computer (in the same way as Edge's claims). The *Ultramercial* Court explained:

> That the disclosed invention is only used on computers or computer networks cannot alone satisfy the machine test without rendering the test completely toothless. As already stated above, the machine must limit the invention in a meaningful way. One cannot circumvent the patentability test merely by limiting the use of the invention to a computer. The binary representation, one of the most fundamental concepts that has enabled digital computation as we know it today, was not patentable, even though its utility was linked to 'general-purpose digital computers.' Similarly, in the case of the '545 patent, the concept of advertisement-media-exchange does not become patentable simply because the patentee claims to have limited its application to the Internet or computers. Therefore, the '545 patent fails the machine test. [*Id.* at 5.]

Revealingly, Edge's Opposition cites only a *single 2008 PTO decision* to support its claim that its "two [general purpose] computer configuration" is somehow patentable (p. 12), notwithstanding that this decision was issued long before *Bilski*; and Edge's Opposition attempts to deal with the entire "machine" prong of the machine-or-transformation test—the test identified by the *Bilski* Court as "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under Section 101," *Bilski*, 130 S. Ct. at 3227— in a single, three-line, conclusory footnote (p. 9 n.8), that contains not even a *single citation to any supporting judicial or PTO decision*. Accordingly, Edge Argument #2 should be seen for what it really is: a legally unsupported (and unsupportable) attempt to bamboozle the Court into believing that there is some grand claim limitation dispute that bears on the threshold, patentable subject matter issue (and that cannot presently be resolved). In reality, *even if Edge's claim*

10

*limitation argument is accepted as true for purposes of this motion, Edge's claims still fail the governing patentable subject matter tests, as those claims plainly attempt merely to monopolize abstract ideas using a computer.*[9]

**Edge Argument #3** - **Edge suggests that the Court should not decide the patentable subject matter issue now because, according to Edge, "the Court must first construe the claims." (Edge Opp. at 10, n. 10.)**

Once again, setting aside the fact that Edge makes this argument only in a five-line footnote that includes no legal support (Edge Opp. at 10 n.10), the authorities are clear that this Court need not construe the claims of the patents-in-suit to conduct the threshold patentability analysis. *See Cybersource v. Retail Decisions, Inc.*, 2009 WL 815448, at *5-10 (N.D. Cal. Mar. 27, 2009) ("[R]uling on defendant's section 101 motion does not require that the claims actually be construed.") Instead, the Court need only broadly determine whether the supposed "machine" claim terms cited by Edge's Opposition—"backend computer," "trader station," "receiver interface," and "output interface," (Edge Opp. at 4 )—refer to and include general purpose computer equipment, as the courts and the Patent Office repeatedly have held that merely reciting the use of such general purpose equipment to perform previously manual or mental tasks does not qualify as patentable subject matter. *See DealerTrack*, 2009 WL 2020761, at *3-4 (discussing multiple Patent Office decisions in rejecting claims comprising "nothing more than a

---

[9] Edge's approach to the "transformation" prong of the "machine-or-transformation" test is indicative of Edge's scattershot approach to opposing Wolverine's motion. Edge's assertion that it meets the "transformation" test is set forth in a single, conclusory, unexplained and unsupported sentence in footnote 15 of Edge's Opposition. Edge's failure to expound is unsurprising given that the law does not support Edge's position. First, it is indisputable that the market data referenced by Edge's claims does not *transform* into anything new: rather, the data is simply *used* by a computer program to decide whether or not an order should be sent—the data, itself, remains unchanged. Second, the asserted claims are of the precise type that the *Bilski* court found *not* to be transformations: manipulations of "public or private legal obligations or relationships, business risks, or other such abstractions." *Bilski*, 545 F.3d 943, 963 (Fed. Cir. 2008); *see also Forman*, 2009 WL 2563527, at *6; *Ultramercial*, 2010 WL 3360098, at *5.

11

general purpose computer that has been programmed in some unspecified manner"); *see also* authorities cited in Footnote 4, *supra*.[10]

As stated by the *Ultramercial* Court only eight weeks ago when dismissing a patent infringement complaint (pursuant to Rule 12(b)(6)) for lack of patentable subject matter:

> [T]he Court rejects Plaintiff's argument that this Motion should not be decided before claim construction. While the Court (and the parties) consulted the claims and the specification, there is no need to formally construe any of the claims. The patent terms are clear, and Plaintiff has not brought to the Court's attention any reasonable construction that would bring the patent within patentable subject matter. [*Ultramercial*, 2010 WL 3360098, at *6.]

As demonstrated in the attached Exhibit A, the Edge patent specifications are crystal-clear that the "machines"/hardware mentioned in the asserted patent claims are nothing more than general purpose computers with general purpose connections/interfaces to a network (like the Internet): "In a typical set-up, trading information received from the exchange is processed by <u>general purpose backend computer equipment</u>. . . . The receiver interface and the output interface <u>may be formed by common equipment and/or data ports</u>." ('629 Patent at 2:54-58, 15:19-21; *see also* '833 Patent at 2:5-7, 19:35-36).[11]

Ultimately, given the wealth of authorities establishing that (a) merely using the term "system" or "machine" in a patent claim does not exempt that claim from patentable subject

---

[10] Edge again tries deliberately to confuse the Court by including the terms "data reference logic," "data structure," "decision logic," and "transaction value calculator," in its purported list of "machine" elements from the patent claims. (Edge Opp. at 4.) It is clear from reading the claims and the patent specifications, however, that these terms are entirely software elements (i.e., aspects of the trading programs that have no hardware components and that "exist" only in the program itself). Edge does not even *try* to specify any particular or unique hardware components associated with these elements. *See* Ex. A.

[11] Any necessary, limited claim construction analysis can (and should) be conducted (1) on the basis of the patents themselves, which are exhibits to Edge's Complaint; and (2) at the motion to dismiss stage. *See Cotapaxi*, 2007 WL 2908265, at *3-4; *Select Controls*, 2008 WL 216612, at *2-4; *Clark*, 2009 WL 1850191, at *4-5; *Vigil v. Walt Disney Co.*, 232 F.3d 911 (Table) (Fed. Cir. 2000); *Kellman v. Coca-Cola Co.*, 280 F. Supp. 2d 670 (E.D. Mich. 2003).
    The Edge patent specifications (on which any desired claim analysis must be based) are attached to Edge's Complaint; and perhaps more importantly, Edge's Opposition does not assert that any of its purported "machine" claim terms have unusual meanings, or meanings that cannot be determined simply by reading the patents themselves.

matter analysis; and (b) merely specifying the use of general purpose computers does not permit a patentee to monopolize abstract ideas (like "fully automated" derivatives trading, or use of "low-overhead" computers as part of automated trading), Edge's various arguments must fail, and this Court, like the *Ultramercial* court, should dismiss this case (and Edge's patents) for a failure to claim patentable subject matter under Section 101.

II. **THE AMENDED COMPLAINT'S ALLEGATIONS FAIL TO ADEQUATELY INFORM WOLVERINE HOW IT ALLEGEDLY INFRINGES.**

Edge's Opposition makes clear that the only substantive allegation added to the Amended Complaint in response to the Court's Order for a more definite statement as to Wolverine's allegedly infringing activities is found in Paragraph 96, where Edge alleges that on January 27, 2009, Wolverine entered into five options transactions that, because of their speed, must have been made electronically (rather than via human action). *See* Edge Opp. at 14-15. Despite the fact that Edge admitted in its earlier briefing that not all electronic/algorithmic trading can or does infringe the asserted patent claims—specifically, Edge admitted that electronic trades executed as part of market-making, auto-quoting or equities trading are not covered by the claims, nowhere in the Amended Complaint does Edge specify any reasonable or substantial basis for its allegation that Wolverine's January 27 trades were infringing, as opposed to non-infringing. *See* Am. Compl. ¶¶ 96-97; *see also* Edge Opp. to Barclay's Mot. to Dismiss [Original] Compl. at 2 n.2, 10-11; Edge Sur-Reply to Wolverine's Mot. to Dismiss [Original] Compl. at 6. The Amended Complaint once again boils down to nothing more than an allegation that because Wolverine has made electronic trades (five to be exact), there might be infringement. Although Edge argues that this generic identification of electronic trades is enough to provide Wolverine with notice of its allegedly infringing activities, this Court already rejected Edge's similarly-generic allegations in the original Complaint. (*See* Order of Oct. 20, 2009 at 1; Compl. at ¶¶ 37-45.)

13

As recognized by this Court, to pass muster under the Federal Rules of Civil Procedure, *Twombly* and *Iqbal*, allegations of patent infringement (a) must allow a defendant to ascertain, with some precision, the specific activities accused of infringement, and (b) must sufficiently distinguish between infringing and non-infringing activities. Even if Edge's allegations surrounding the five January 27, 2009 trades are taken as true, the allegations do not show any reasonable basis for concluding that these trades were infringing, as opposed to non-infringing electronic trades executed as part of Wolverine's acknowledged market-making and auto-quoting activities. In fact, Edge does not even attempt to explain *what* about these Wolverine trades make them infringing as opposed to non-infringing; Edge's allegations certainly do not allege any facts establishing a reasonable and/or plausible basis for Edge's infringement allegations. In short, Edge is saying, "Right now, we don't have any specific reason to conclude that infringement has occurred, but give us time and discovery and we might find some reason."[12]

Make no mistake, Edge's goal here is to force Wolverine to engage in costly and highly disruptive discovery on the slim, shot-in-the-dark chance that Edge might uncover something—anything—to help build an infringement claim. Any doubt about this was eliminated by Edge's Opposition statement that, though it only identified five options trades that may or may not infringe, Edge plans to engage in unbounded discovery of all of Wolverine's activities. Indeed, Edge states that it "anticipates that discovery will show that additional system claims and/or method claims from each patent are, and have been, infringed by Wolverine." (*Id.* at 2 n.2.)

---

[12] Edge cannot seriously be claiming that all electronic/algorithmic trading infringes its patents, as Edge already admitted in prior briefing that certain electronic/algorithmic trading activity such as equities trading, market-making and auto-quoting would not infringe. (*See* Edge Opp. to Barclay's Mot. to Dismiss [Original] Compl. at 2 n.2, 10-11; Edge Sur-Reply to Wolverine's Mot. to Dismiss [Original] Compl. at 6.) If Edge is permitted to obtain discovery based purely on an identification of five trades purportedly made using a computer, then every company and person in America who makes a derivative or stock trade using a computer and/or the Internet is subject to Edge's discovery.

Finally, Edge tries to sidestep its pleading deficiencies by arguing, incredibly, that because Wolverine was able to write a motion to dismiss based on the '829 and '633 Patents' failure to claim patentable subject matter, Wolverine must "understand[] the type of trading activity to which asserted claims are directed." (Edge Opp. at 15 n.17.) Setting aside the fact that Wolverine's ability to legally analyze a patent, on its face, *says nothing whatsoever* about Wolverine's understanding (or confusion) regarding Edge's unbounded and ungrounded infringement accusations, Edge provides no support for its novel and self-serving theory that Wolverine's filing of a literate motion to dismiss somehow entitles Edge to ignore this Court's Order for a more definite statement, to dispense with the governing pleading requirements, and to engage in the fishing expedition that *Twombly* specifically prohibits. *See Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 802-03 (7th Cir. 2008) ("[*Twombly*] teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case."). Edge has not complied with this Court's Order and has not sufficiently alleged infringement by Wolverine of the identified patent claims. Accordingly, the Court should dismiss Edge's Amended Complaint and prevent Edge from using grossly insufficient infringement allegations to extract discovery from Wolverine that is not warranted.[13]

    Dated: October 22, 2010

Respectfully submitted,
By: /s/ Robert W. Unikel
Robert W. Unikel
Deanna L. Keysor
Michelle K. Marek
KAYE SCHOLER LLP
70 W. Madison Street, Suite 4100
Chicago, IL 60602-4231

---

[13] At a bare minimum, if Edge is permitted to proceed on its infringement claims, as pled, then Edge should be permitted discovery *solely as to the exact five trades on which it bases its entire Amended Complaint against Wolverine*. Any suggestion by Edge that it is entitled to conduct discovery on unpled claims and/or unpled trading activity must be rejected.

 robert.unikel@kayescholer.com
 deanna.keysor@kayescholer.com
 michelle.marek@kayescholer.com
 Tel: 312.583.2340
 Fax: 312.583.2300

*Attorneys for Defendants Wolverine Trading L.L.C. and Wolverine Execution Services L.L.C.*

**CERTIFICATE OF SERVICE**

I, Robert W. Unikel, hereby certify that I caused a copy of the attached **Reply Memorandum in Support of Defendants Wolverine Trading, L.L.C. and Wolverine Execution Services, L.L.C.'s Motion to Dismiss Amended Complaint** to be served on October 22, 2010 upon counsel of record as follows:

**By CM/ECF Notification**:

Gavin James O'Keefe
gokeefe@gbclaw.net
Jeana R. Lervick
jlervic@gbclaw.net
Patrick G. Burns
pburns@gbclaw.net
Greer Burns & Crain Ltd.
300 South Wacker Drive
Suite 2500
Chicago, Illinois 60606

Glenna Lynn Gilbert
glgilbert@rkmc.com
Munir R. Meghjee
mrmeghejee@rkmc.com
Ronald Schutz
rjschutz@rkmc.com
Sang A. Young Brodie
sybrodie@rkmc.com
Robins Kaplan Miller & Ciresi LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402

*Attorneys for Plaintiffs Edge Capture L.L.C. and Edge Specialists L.L.C.*

Allan M. Soobert
allansoobert@paulhastings.com
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

Emily Newhouse Dillingham
emilydillinghman@paulhastings.com
Paul Hastings Janofsky & Walker LLP
191 N. Wacker Drive
Chicago, Illinois 60606

Jeffery G. Randall
jeffrandall@paulhastings.com
Paul Hastings Janofsky & Walker LLP
Palo Alto, California 94304

*Attorneys for Defendants Barclays Bank PLC, Barclays Capital Inc., UBS AG, UBS Financial Services Inc., and UBS Securities, L.L.C.*

                                            /s/ Robert W. Unikel
                                            Robert W. Unikel