IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDGE CAPTURE L.L.C., and EDGE SPECIALISTS, L.L.C., <br><br> Plaintiffs, <br><br> v. <br><br> BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., UBS AG, UBS FINANCIAL SERVICES, INC., UBS SECURITIES, L.L.C., WOLVERINE TRADING, L.L.C., AND WOLVERINE EXECUTION SERVICES, L.L.C., <br><br> Defendants. | Civil Action No. 09 CV 1521 <br><br> Judge Charles R. Norgle, Sr. <br><br> Magistrate Judge Denlow <br><br> **JURY TRIAL DEMANDED** |

**REPLY IN SUPPORT OF PLAINTIFFS EDGE CAPTURE L.L.C.'S AND EDGE SPECIALISTS, L.L.C.'S MOTION TO COMPEL THE BARCLAYS AND UBS DEFENDANTS TO COMPLY WITH LOCAL PATENT RULE 2.1(b)(1) (D.E. 191)**

**I.    INTRODUCTION.**

The Court should compel Barclays Bank PLC and Barclays Capital Inc. ("Barclays"), and UBS AG, UBS Financial Services, Inc., and UBS Securities, L.L.C. ("UBS") (Barclays and UBS shall be collectively referred to as "Defendants"), to comply with the disclosure requirements of Local Patent Rule 2.1(b)(1). Defendants have not produced documents sufficient to show the "operation and construction" of the system(s) that engaged in the trades cited in the Amended Complaint. The trading activity identified in the Amended Complaint is the foundation for Edge's patent infringement claims and is activity that Judge Norgle has already found to be "specific examples of . . . commercial transactions involving plausible patent infringement." (D.E. 134 at 2.)

Defendants stand behind a wall of secrets and confidential information to avoid providing Edge with technical documentation available only to Defendants but to which Edge is entitled under the

- 1 -

82410659.4

Patent Local Rules and the case schedule agreed to by Defendants. Defendants seek to restrict Edge to publicly available information about their trading systems and activities while keeping **the details and inner workings of those systems secret and hidden from the Edge.** Defendants' demand <u>detailed</u> initial infringement contentions but refuse to disclose the information required to provide such detailed contentions.

Defendants' conduct during the meet-and-confer process makes clear that they always intended on withholding the technical documents to which Edge is entitled. Defendants initially glossed over the same type of information that enabled co-defendant Wolverine to identify the trades described in the Amended Complaint. Then, after feigning interest in obtaining additional information from Edge (e.g., the trade identification codes that Defendants conceded they could use to make positive identifications) to identify the trades and trading systems identified in the Amended Complaint, Defendants switched gears midstream and unreasonably refused to use the information. Defendants may not now refuse to consider the trade identification codes or any other information that is allegedly necessary to identify the trades and trading systems described in the Amended Complaint.

## II. THE SPECIFIC INSTRUMENTALITIES ACCUSED OF INFRINGEMENT IN THE AMENDED COMPLAINT ARE THE TRADES DESCRIBED THEREIN AND THE SYSTEMS THAT ENGAGED IN THOSE TRADES.

Edge has repeatedly stated to Defendants in no uncertain terms that the accused systems and activities are those described in detail, although not by name, in paragraphs 57-60 (and 63-66) of the Amended Complaint for Barclays and paragraphs 76-80 of the Amended Complaint for UBS. These are the infringing systems and activities that presently support Edge's patent infringement claims.

Defendants try to confuse the issues by attempting to establish that the Accused Instrumentalities are Work and Pounce, Vol Trader, Smart Router, Pinpoint, and other named tools/products. Edge referred to those tools in the Amended Complaint to show Defendants'

commitment to technology but, as Edge clearly explained to Defendants, those tools are relevant for purposes of LPR 2.1(b)(1) initial disclosures **only to the extent** that they were used in connection with or to conduct the specific trades identified in the Amended Complaint. They do not, however, independently form a basis for Edge's patent infringement claims. And because it appears, by way of Defendants' silence, that Defendants did not use any of those tools to engage in the trades cited in the Amended Complaint, Edge has not requested that Defendants produce additional technical documents about the tools. However, Edge has not conceded, as Defendants contend, that Defendants' productions regarding those tools satisfy their LPR 2.1(b)(1) disclosure obligations. They do not. Edge further informed Defendants that their productions regarding those tools only included "high level information." (Brodie Decl. D.E. 192-9 at ¶ 3, Ex. 1.)

## III. THE AMENDED COMPLAINT CONTAINS SUFFICIENT INFORMATION FOR DEFENDANTS TO IDENTIFY THE TRADES AND/OR THE TRADING SYSTEMS THAT ENGAGED IN THOSE TRADES.

Edge provided Barclays with detailed information available to Edge about Barclays' infringing activities in paragraphs 57-60 of the Amended Complaint. Those paragraphs read as follows:

> 57. On information and belief, **Barclays Capital has trading computers located at least at the CBOE** that are communicatively linked to at least the CBOE's exchange servers.
>
> 58. **These trading computers**, when enabled, receive market price information for options contracts from the CBOE and automatically submit buy and/or sell orders for options contracts based on at least the received market price information in a speedy and automated fashion. For example, **Barclays Capital entered into six separate transactions for options contracts with account acronym GRF on January 27, 2009**. Each of the six transactions was executed within less than approximately 205 milliseconds of changing a bid or ask price for an options contract to a desirable price on the CBOE. The speed at which the changes in price were detected by Barclays Capital, and the speed of the transactions executed, exclude human intervention. The average length of a blink of an eye, for example, is 300 to 400

> milliseconds. *See* http://en.wikipedia.org/wiki/Blink (visited November 29, 2009).
>
> 59. The six transactions identified in the preceding paragraph logically demonstrate that **Barclays Capital's trading computers** have receiver interfaces for receiving market price information, decision logic for making buy and/or sell decisions for options contracts, and output interfaces for submitting buy and/or sell orders for options contracts.
>
> 60. The six transactions further show that **Barclays Capital's trading computers** contain (1) calculators that compute transaction values for derivatives in real-time and/or (2) data reference logic that outputs transaction values for derivatives from data structures storing pre-calculated transaction values. However, because the details of Barclays Capital's trading systems' architecture, programming, and functions are kept confidential and secret from the public, Edge cannot know whether Barclays Capital includes one or both of the elements in its systems without the benefit of discovery.

(D.E. 74) (emphasis added.) Edge provided UBS with similar detail in paragraphs 76-80 of the

Amended Complaint:

> 76. On information and belief, **UBS Securities and UBS Financial have trading computers that are communicatively linked to the CBOE's** computer exchange servers.
>
> 77. . . . On information and belief, UBS Securities and UBS Financial have **network equipment at the CBOE that connects UBS's trading computers to the CBOE's exchange serv**ers.
>
> 78. **UBS Securities' and UBS Financial's trading computers**, when enabled, receive market price information for options contracts from the CBOE and automatically submit buy and/or sell orders for options contracts based on at least the received market price information in a speedy and automated fashion. **For example, one or both of the UBS entities entered into two separate transactions for options contracts with account acronym GRF on January 27, 2009.** Each of the two transactions was executed within less than approximately 246 milliseconds of changing a bid or ask price for an options contract to a desirable price on the CBOE. The speed at which the changes in price were detected by UBS, and the speed of the transactions executed, exclude human intervention. The average length of a
- 4 -

<s>82410659</s>

> blink of an eye, for example, is 300 to 400 milliseconds. *See* http://en.wikipedia.org/wiki/Blink (visited November 29, 2009).
>
> 79. The two transactions identified in the preceding paragraph logically demonstrate that **UBS Securities' and UBS Financial's trading computers** have receiver interfaces for receiving market price information, decision logic for making buy and/or sell decisions for options contracts, and output interfaces for submitting buy and/or sell orders for option contracts.
>
> 80. The two transactions further show that **UBS Securities' and UBS Financial's trading computers** contain (1) calculators that compute transaction values for derivatives in real-time and/or (2) data reference logic that outputs transaction values for derivatives from data structures storing pre-calculated transaction values. However, because the details of UBS Securities' and UBS Financial's trading systems' architecture, programming, and functions are kept confidential and secret from the public, Edge cannot know whether UBS Securities and UBS Financial include one or both of the elements in their systems without the benefit of discovery.

(*Id.*) (emphasis added.)

The above information is sufficient to enable Defendants to identify the cited trades and/or the trading systems used to make those trades. Indeed, using basically the same descriptive information, co-defendant(s) Wolverine had no trouble identifying the specific examples of infringing commercial transactions (*i.e.,* the trades) involving plausible patent infringement. (*See* D.E. 147, Answer to ¶ 95.)

Defendants submitted two declarations to support their argument that they could not identify the eight trades (six for Barclays and two for UBS) cited in the Amended Complaint amidst potentially "tens or hundreds of thousands of transactions on the CBOE on any given day[.]" (*See* Larson Decl. D.E. 208-8 at ¶ 5(b); *see also* Jackman Decl. D.E. 208-9 at ¶ 5(b).) However, a careful reading of the two declarations, which are virtually identical in substance, shows that while declarants Larson and Jackman focused their attention on trying to identify the eight specific transactions, they likely did not separately attempt to identify the trading systems that were (1) trading options on the CBOE on January

27, 2009, (2) in an automated fashion, and (3) reacting to changes in bid or ask prices at speeds of less than 205 milliseconds for Barclays and 246 milliseconds for UBS. Indeed, although Larson and Jackman each devote six paragraphs (including subparagraphs) to issues relating to identifying the transactions described in the Amended Complaint, they do not devote any paragraphs specifically addressing the criteria above as it relates to Defendants' trading systems.[1]

For all Edge knows, Barclays and UBS each have only one automated trading system that meet the system criteria described in the Amended Complaint. They have never denied this fact, even when asked during meet-and-confers. Indeed, Edge never received answers from Barclays to the following questions that counsel for Barclays admitted were not specifically asked during its investigation, and that Edge derived from the Amended Complaint and posed in good-faith to help Barclays identify the cited trades and/or trading systems:

- Which of Barclays' trading systems are located at the CBOE?
- Which of Barclays' trading systems are communicatively linked to the CBOE's computer exchange servers?
- Which of Barclays' trading systems receive market price information for options contracts from the CBOE?
- Which of Barclays' trading systems trade options contracts on the CBOE?
- Which of Barclays' trading systems traded options contracts on the CBOE on January 27, 2009?
- Which of Barclays' trading systems that traded on the CBOE on January 27, 2009 engaged in automated trading?
- Which of Barclays' trading systems that traded on the CBOE on January 27, 2009, are capable of submitting orders or quotes for options contracts within less than approximately 205 milliseconds of a change in a bid or price for an options contract?

(Brodie Decl. D.E. 192-9 at ¶ 7, Ex. 4) Edge asked a similar set of questions of UBS. (*Id.*) As with

---

[1] Larson and Jackman may not know how their respective employers conducted their investigations, as each qualified their declarations by writing: "I understand that Barclays [UBS] was unable to isolate or otherwise identify the purported transactions based on its internal investigation of the information from the Amended Complaint." (D.E. 208-8, at ¶ 6; and D.E 208-9, at ¶ 6.) Neither declarant endorsed the scope or quality of the investigation.

Barclays, Edge received no specific answers from UBS to its questions.

The Amended Complaint contains sufficient information for Defendants to identify the Instrumentalities specifically accused of infringement.

## IV. DEFENDANTS SHOULD USE THE ADDITIONAL INFORMATION THAT EDGE PROVIDED TO DEFENDANTS, PURSUANT TO THEIR REQUESTS, TO IDENTIFY THE TRADES IN THE AMENDED COMPLAINT.

Defendants should use the trade identification codes that Edge provided to identify the trades and trading systems described in the Amended Complaint. In a good-faith effort to help Defendants make the relevant identifications, and pursuant to Defendants' request for "further information about the alleged trades at issue" (Brodie Decl. D.E. 192-9, at ¶ 8, Ex. 5), Edge gave the Defendants the trade identification codes for the trades described in the Amended Complaint. The trade identification codes are codes that uniquely identify the trades, and are captured and maintained by Defendants.

The Court recently issued an order making clear that it would be improper to ignore facts that are relevant to allegations in Edge's Amended Complaint. Judge Norgle acknowledged that the parties may present essential facts at a later time to add to the completeness of a pleading:

> It is true that these allegations are not pleaded in Wolverine's affirmative defenses or counterclaims. But Wolverine **need not put all of the essential facts in its counterclaims, and may add any facts** that could be proved consistent with the allegations in the counterclaims by a brief.

(D.E. 207 at 9) (citations omitted) (emphasis added.) That is precisely what Edge has done here. Edge provided Defendants with additional facts relating to and consistent with the eight trades (six for Barclays and two for UBS) described in the Amended Complaint. Accordingly, Defendants must consider and use this information as well as "any" other facts that enable them to identify the accused trades and the systems that engaged in those trades.[2] Defendants have no option.

---

[2] Larson and Jackman both make the claim in their declarations that, "Even if Barclays [UBS] was given sufficient information to isolate these alleged transactions, Barclays [UBS] would not necessarily

In addition to the law, notions of fairness and equity demand that Defendants use the trade identification codes and any other information necessary to identify the trades described in the Amended Complaint and the systems that engaged in those trades. Throughout the meet-and-confer process, Defendants professed to be working with Edge in good faith to make the relevant identifications: "We did state that we were (and remain) willing to work with you in good faith and that our clients would consider any information you might provide." (D.E. 192-7 at 3.) Defendants also stated that "our clients will investigate these [trade identification] codes." (*Id.* at 4.) Yet, when the meet-and-confer process ran its course, Defendants refused to use the additional information to make the identifications and Edge found itself back where it started—no commitment by Defendants to provide Edge with documents sufficient to show "operation and construction" of the system(s) that engaged in the trades cited in the Amended Complaint. After leading Edge along under the veil of good faith, Defendants should now be required to use the additional information they requested (and received) from Edge to (1) identity the trades and trading systems described in the Amended Complaint, and (2) produce under LPR 2.1(b)(1) documents sufficient to show "operation and construction" of the system(s) that engaged in the trades cited in the Amended Complaint. Anything less would be unfair to Edge and would encourage Defendants to continue trying to block Edge from obtaining relevant discovery in a timely fashion.

## V. DEFENDANTS MUST COMPLY WITH THEIR LPR 2.1(b)(1) INITIAL DISCLOSURE OBLIGATIONS.

Barclays and UBS continue to stand in violation of their obligations under LPR 2.1(b)(1) to produce documents "sufficient to show the operation and construction of all aspects or elements" of the trading systems that engaged in the trades described in the Amended Complaint. Barclays and UBS

---

be able to identify the specificity of the system(s), if any, that are targeted by Edge's allegations." (D.E. 208-8 at ¶ 6; D.E. 208-9 at ¶ 6.) While these statements are curious, they do not make the untenable claim that the systems associated with identified trades cannot themselves be identified.

should be compelled to produce documents regarding "the operation and construction of all aspects" of those trading systems, including documents relating to the systems' architecture, programming, and functions, such as system schematics, CAD drawings, system design documents, system component data sheets/books, service or user manuals, software design documents, and functional descriptions of the system and software.[3] Edge is entitled to this information.[4]

## VI. CONCLUSION

For all the above reasons and the reasons stated in Edge's opening brief, Edge's motion to compel should be granted in its entirety.

Dated: August 5, 2011

Respectfully submitted,

By: /s / Sang Young A. Brodie
Ronald J. Schutz (*pro hac* vice)
Munir R. Meghjee (*pro hac* vice)
Sang Young A. Brodie (*pro hac* vice)
Glenna L. Gilbert (ARDC No. 6286244)
Miles A. Finn (*pro hac* vice)
Seth A. Nielsen (*pro hac* vice)
**ROBINS, KAPLAN, MILLER & CIRESI L.L.P**.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500

Patrick G. Burns (ARDC No. 3122589)
Jeana R. Lervick (ARDC No. 6277887)

---

[3] In the interest of narrowing the scope of documents to be produced under LPR 2.1(b)(1), Edge offered to drop its demand for the production of software and source code in the initial disclosure phase.

[4] In footnote 9 of Defendants' response brief, Barclays and UBS claim that "[t]o the extent the transactions related to market making or involved systems used for market making, the transactions and/or systems are not relevant to the case, in light of Edge's own contentions." (D.E. 208 at 11 n.9.) This argument sails wide of the mark for the same reasons why Wolverine's noninfringement "market making" argument fails. The transactions identified in the Amended Complaint and the systems that engaged in those trades are infringing instrumentalities. As explained more fully in Edge's Reply to its motion to compel against Wolverine and in the attached tutorial, the trades cited in the Amended Complaint are examples of infringing price taking activity and the systems that engaged in that price taking activity infringe the patents.

82410659

Gavin James O'Keefe (ARDC No. 6293489)
**GREER, BURNS & CRAIN, LTD.**
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
Telephone: (312) 360-0080

**ATTORNEYS FOR PLAINTIFFS
EDGE CAPTURE L.L.C. AND EDGE
SPECIALISTS, L.L.C.**

## CERTIFICATE OF SERVICE

    The undersigned attorney hereby certifies that on August 5, 2011, he caused a true and correct copy of **REPLY IN SUPPORT OF EDGE CAPTURE L.L.C.'S AND EDGE SPECIALISTS, L.L.C.'S MOTION TO COMPEL THE BARCLAYS AND UBS DEFENDANTS' TO COMPLY WITH LOCAL PATENT RULE 2.1(b)(1) (D.E. 191)** to be served via electronic mail on the following attorneys of record in this case:

| | |
|---|---|
| Jeffrey G. Randall | jeffrandall@paulhastings.com |
| Allan M. Soobert | allansoobert@paulhastings.com |
| Jeffrey D. Comeau | jeffreycomeau@paulhastings.com |
| Emily Newhouse Dillingham | emilydillingham@paulhastings.com |
| Robert W. Unikel | robert.unikel@kayescholer.com |
| Deanna L. Keysor | deanna.keysor@kayescholer.com |
| Michelle Kristina Marek | michelle.marek@kayescholer.com |

                                                  /s/ Patrick G. Burns
                                                  Patrick G. Burns