**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EDGE CAPTURE L.L.C., and EDGE SPECIALISTS, L.L.C., <br><br>Plaintiffs,<br><br>v.<br><br>BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., UBS AG, UBS FINANCIAL SERVICES, INC., UBS SECURITIES, L.L.C., WOLVERINE TRADING, L.L.C., AND WOLVERINE EXECUTION SERVICES, L.L.C.,<br><br>Defendants. | Civil Action No. 09 CV 1521<br><br>Judge Charles R. Norgle, Sr.<br><br>Magistrate Judge Denlow<br><br>**JURY TRIAL DEMANDED** |

**REPLY IN SUPPORT OF PLAINTIFFS EDGE CAPTURE L.L.C.'S AND EDGE SPECIALISTS, L.L.C.'S MOTION TO COMPEL THE WOLVERINE DEFENDANTS TO COMPLY WITH LOCAL PATENT RULE 2.1(b)(1) (D.E. 197)**

**I.    INTRODUCTION.**

The Court should compel Wolverine to comply with its LPR 2.1(b)(1) Initial Disclosure Obligations. Wolverine has not produced documents sufficient to show the "operation and construction" of the system(s) that engaged in the five trades cited in the Amended Complaint.

Wolverine may not thwart its discovery obligations by treating Edge's motion to compel as if it were Wolverine's motion for summary judgment of noninfringement. Wolverine has not moved for summary judgment and, as Wolverine well knows, there has been no determination by the Court that Wolverine did not infringe the patents when it used its automated trading systems to engage in the five trades identified in the Amended Complaint. In fact, the opposite is true. Judge Norgle expressly found that the five trades identified in the Amended Complaint are "specific examples of Wolverine's commercial transactions involving plausible patent

82410664

infringement." (D.E. 134 at 2.) Indeed, Wolverine's admission that it engaged in those five trades confirms that it used trading systems and methods that infringe one or more claims of the patents-in-suit. Wolverine's acknowledgement of the trades is a confession of infringement, not proof of noninfringement.

To evade this fact, Wolverine misleads this Court by grossly distorting Edge's use of the terms "marketing making" and "quoting activities, used to make markets" in briefs filed with this Court. Wolverine fails to acknowledge that Edge considers the five trades cited in the Amended Complaint as exemplars of trading activity that is covered by the patent claims. Instead, Wolverine substitutes its own broad definitions for the terms "market making" and "quoting activities used to make markets" to wrongly argue that Edge has conceded noninfringement for everything Wolverine does. Not so. Under the definitions Edge employed—definitions consistent with the definition of "market maker" that Wolverine cites to in footnote 1 of its response—it is manifest that Wolverine's admitted trading activity is infringing activity.

When Edge referred to "marketing making" and "quoting activities, used to make markets," in its briefs, Edge was referring to **price making** activities by market makers to maintain liquidity in the market. In contrast, the trades cited in the Amended Complaint are examples of opportunistic **price taking** activities covered by the patents. Wolverine was a **price taker** in each of the five trades cited in the Amended Complaint. And when Wolverine acted as **price taker**, as described in the Amended Complaint by way of transaction examples, it was a patent infringer, regardless of its market maker status. It is the type of trading activity that is relevant to determining infringement, not one's status as a market maker at an exchange.

## II. WOLVERINE'S LPR 2.1(b) INITIAL DISCLOSURE OBLIGATIONS HAVE NOT BEEN EXCUSED.

Wolverine must comply with its initial disclosure obligations under the Local Patent Rules. Wolverine's position that it is relieved of its LPR 2.1(b)(1) disclosure obligations because it purportedly "produced evidence that proves that the five identified trades *cannot* infringe either of Edge's patents" (D.E. 209 at 1) is untenable. Wolverine bases this argument solely on the fact that one of the five documents that it produced labels the account connected with the five trades identified in the Amended Complaint as a "market maker" account. None of the documents, however, present any information regarding the construction or operation of the system(s) that conducted those five trades.

In fact, the documents Wolverine produced confirming the five trades support Edge's position—**Wolverine infringed one or more claims of the patents-in-suit**. And contrary to Wolverine's baseless accusations, Edge is interested in those trades, and in the systems and methods that were used to engage in those trades.

### A. There is no ruling that Wolverine did not infringe the patents when it engaged in the five trades cited in the Amended Complaint, and the instant motion is not a motion for summary judgment of noninfringement.

Nothing in the record relieves Wolverine of its initial disclosure obligations under the Local Patent Rules. Although Wolverine unjustifiably declares that it is undisputed that the five trades cited Amended Complaint cannot infringe the patents—a claim that Edge vehemently disputes—there is no Court order finding as a matter of law that Wolverine did not infringe the patents when it used its automated trading systems to engage in the five trades identified in the Amended Complaint. Judge Norgle, in fact, reached the opposite conclusion:

> [T]he Court concludes that Edge complied with the Court's order by identifying **specific examples of Wolverine's commercial transactions involving plausible patent infringement**.

(D.E. 134 at 2) (emphasis added.) The record simply undermines Wolverine's contention.

In addition, the instant motion is a discovery motion, not a motion for summary judgment of noninfringement. Wolverine may not convert Edge's motion to compel into a motion for summary judgment. Wolverine improperly invites the Court to commit legal error by asking the Court to rule as a matter of law that Wolverine did not infringe the patents-in-suit when it engaged in the five trades cited in the Amended Complaint. If Wolverine is so confident in its position, it is free to move for summary judgment on the matter. The fact remains, however, that Wolverine has not filed a summary judgment motion and its unilateral conclusion of noninfringement holds no weight, nor does it free Wolverine of its discovery obligations.

B.     **Wolverine must follow the order of events recited in the Local Patent Rules.**

In light of Edge's identification of "specific examples of Wolverine's commercial transactions involving plausible patent infringement" in the Amended Complaint, it is wholly improper for Wolverine to deny Edge the specific discovery to which it is entitled under LPR 2.1(b)(1). Wolverine must follow the order of events contemplated by the Local Patent Rules. Wolverine conceded this point when it joined Edge in requesting a stay of LPR 2.2 – 2.5 deadlines until the Court rules on Edge's motions because the events in Local Patent Rule 2 build on each other. (D.E. 200 at 2.)

Wolverine may not wait until after Edge serves its LPR 2.2 Initial Infringement Contentions before producing technical documents regarding the trading systems that engaged in the trades described in the Amended Complaint. That impermissibly reverses the order of events:

> A party claiming patent infringement must serve on all parties "Initial Infringement Contentions" containing the following information within fourteen (14) days **after the Initial Disclosure under LPR 2.1** . . . .

(LPR 2.2) (emphasis added.) Wolverine must first produce technical documents regarding the specifically accused instrumentalities (the systems and methods that Wolverine used to engage in the five trades cited in the Amended Complaint); then, after Edge has had the opportunity to study the initial disclosures contemplated by LPR 2.1(b)(1), Edge is to serve its LPR 2.2 Initial Infringement

Contentions, based on Wolverine's initial disclosures. Then, after Edge serves its LPR 2.2 Initial Infringement Contentions, Wolverine is to serve its LPR 2.3 Initial Non-Infringement, Unenforceability and Invalidity Contentions. This is the order of events contemplated by the Local Patent Rules and **the order of events Wolverine agreed to** when it jointly submitted the Agreed Upon Scheduling Order (D.E. 178) and the motion to stay the LPR 2.2 – 2.5 deadlines (D.E. 200). Wolverine may not reverse the order of events because it now sees a tactical advantage in doing so.

### III. THE FIVE TRADES THAT WOLVERINE ADMITS TO ENGAGING IN ARE EXAMPLES OF INFRINGING ACTIVITY.

The five trades cited in the Amended Complaint are the types of trades that result in infringement. It does not matter if they are connected with an account labeled "market maker."

To circumvent Edge's position on this matter, Wolverine misleads this Court by grossly distorting Edge's use of the terms "marketing making" and "quoting activities, used to make markets" to support Wolverine's argument of noninfringement.

#### A. Edge's references to "market making" refer to "price making" activities by market makers to maintain liquidity in the market, not to their "price taking" activities.

In its prior briefing, Edge referred to "marketing making" and "quoting activities, used to make markets," in the following, generally and commonly understood manner: [1]

- Edge's use of the term "market making" refers to **price making** activities by market makers;

---

[1] Wolverine wrongfully accuses Edge's counsel of misleading the Court at the presentment hearing regarding the use of terms in connection with purported prior art. Not so. Edge did use market making terms (and, in particular, the concept of auto quoting) in connection with prior discussions of non-invalidating purported prior art. Wolverine acknowledged this fact in its response brief. *See, e.g.,* D.E. 209 at 3 ("In distinguishing prior art that UBS and Barclays had cited, Edge described that prior art as covering market making systems, and thus not relevant to the asserted patents: 'CBOE's Auto Quote System purports to disclose an "electronic market quote updating system," which is drastically different from the inventions . . . . Indeed, Auto Quote's purpose is not to submit trade orders, but to allow Market Makers to maintain liquidity in the market.'; 'Like Auto Quote, the Nimble system, as the title of the reference suggests, is at most a "Market Making System"') (citation omitted.)

- Edge's use of the term "quoting activities, which are used to make markets" refers to quoting used in **price making** activities by market makers; and

- Edge's reference to the concept of "[auto] quoting" refers to automated quoting used in **price making** activities by market makers.

In short, all prior discussions relating to market making by Edge are references to **price making** activities by market makers to maintain liquidity in the market.

In stark contrast, the trades cited in the Amended Complaint are examples of opportunistic **price taking** activities covered by the patents. Wolverine was a **price taker** in each of the five trades cited in the Amended Complaint; and, in each of those instances of **price taking**, Wolverine infringed the patents, regardless of its market maker status.[2] It is the type of trading activity ("price making" versus "price taking") that is relevant to determining infringement, not one's status as a market maker at an exchange.

Because "price making" and "price taking" are important concepts in the understanding of the patented technology, Edge will present a brief tutorial at the August 9, 2011 Hearing to assist the Court in understanding the nature of the trades cited in the Amended Complaint and why they demonstrate infringement. The tutorial will include PowerPoint animations, but for the Court's convenience, a static copy of the tutorial is attached as Exhibit 7 to this Reply.[3] Also for the Court's convenience, Edge will present in this Reply select examples from the tutorial of price making and price taking activities.

---

[2] Wolverine alleges in its response brief that each of the five trades cited in the Amended Complaint are "part of Wolverine's market-making obligations as a registered Market Maker on the Chicago Board Options Exchange (CBOE)." (D.E. 209 at 5.) Edge disputes that Wolverine engaged in those trades as part of its contractual market-making obligations to the CBOE. In any event, the point is irrelevant, because the five trades are the type of activity that infringes the one or more claims of the patents-in-suit.

[3] Exhibits 1-6 in support of Edge's motion were submitted with Edge's opening brief. (*See* D.E. 199.)

82410664                                                6

**B.      Everyday example of price making and price taking activities.**

To start, it important to understand that in every transaction there is a price maker and a price taker.



In the above example from slide 8 of the tutorial, the hot dog vendor is the price maker and customer is the price taker. Now, of course, if the opportunity presents itself, their roles could be reversed, such as in the following example from slide 12 of the tutorial:



In this example, the customer is the price maker and hot dog vendor is the price taker.

**C.      Options Terminology.**

Before examples of price making and price taking are provided in the options trading context, it is important to understand some of the terminology that is used in options trading. Here are four terms and definitions that appear in the tutorial:

1) **Ask Price:**   The price at which a **seller** is offering to **sell** an option or stock. http://www.cboe.com/learncenter/glossary.aspx (emphasis added).

2) **Bid Price**:   The price at which a **buyer** is willing to **buy** an option or stock. http://www.cboe.com/learncenter/glossary.aspx (emphasis added).

3) **Orders**:   "Orders are requests to **buy <u>or</u> sell** a specified amount of a particular item at a specified price. An example, a trader may place an order to buy 100 shares of IBM stock for a bid price of 57.25." '833 patent (D.E. 74, Ex. A) col. 1, ll. 36-39 (emphasis added).

4) **Quotes** :   "Quotes differ from orders in that quotes indicate **bid price <u>and</u> ask prices**, and **bid <u>and</u> ask quantities** for a particular item. As an example, a trader may place a quote indicating she is willing to buy 100 shares of IBM stock for a bid price of 57.0 and sell 100 shares of IBM stock at a price of 57.5." '833 patent (D.E. 74, Ex. A), col. 1, ll. 39-44 (emphasis added).

**D.      Example of market making (price making) in an options exchange.**

The illustration below is that of market makers engaged in price making by submitting quotes to the exchange for display to the market to maintain liquidity in market. The exchange displays the best bid and ask prices to the market. (For simplicity, quantities are omitted.)



In the above example from slide 15 of the tutorial, the market makers are market making under the definition that Edge used in its prior submissions.

This example also fits the definition of "market maker" that Wolverine offered in footnote 1 of its response brief: "A 'market maker' is a 'brokerage or bank that maintains a **firm bid and ask price** in a given security by standing ready, willing, and able to buy or sell a publicly quoted prices (called making a market). These firms **display bid and offer price** for specific numbers of specific securities, and if these prices are met, they will immediately buy or sell from their own accounts.'" (D.E. 209 at 2 n.1) (citation omitted) (emphasis added.) In the example above, the market makers are making, maintaining, and displaying bid and offer prices for an option and, if a trader or another market maker accepts (**takes**) the displayed price, then the market makers will immediately buy or sell at that price. This is a guaranteed transaction.

An example of a guaranteed transaction discussed in the preceding paragraph can be found in slide 17 of the tutorial.



The above market making (price making) activities, even if performed by special purpose computers, are not the type of trading activities contemplated by the claims of the patents-in-suit, as Edge noted in previous submissions.

E. **Example of infringing price taking by market makers in an electronic options trading exchange.**

The example below shows an automated computer system operated by a market maker in an electronic options trading exchange, such as the CBOE.



In the above example from slide 23 of the tutorial, the system is price making by quoting bid and ask prices for an option to maintain liquidity in the market, but the system is also waiting for an opportunity to **take** a bid price if another system presents the opportunity.[4]

An opportunity then presents itself, as shown in the example below from slide 24 of the tutorial.



---

4   The system could, of course, also wait for an opportunity to take an **ask** price.

In this example, a trading system operated by different trader or market maker publicly announces that it is willing buy an option at a higher price ($3.95) than what was previously listed ($3.50). However, because the posted ask (sell) price is 5 cents higher than the new bid (buy) price, there is no guaranteed transaction. A system will have to recognize the opportunity and affirmatively submit to the exchange a request to sell the option at $3.95 through an order or a quote for a transaction to occur.

In the next slide, the first trading system quickly recognizes the opportunity and is the first to **take** the price by issuing a request to sell the option at $3.95 through an order or a quote.



Then, a transaction occurs where the market maker is the price taker and contra trader is the price maker.

The above transaction example is the type of trading activity that infringes the claims of the patents-in-suit. Claim 24 of the '833 patent, by way of example, covers the above **price taking** transaction example:

> 24. An automated trading method for use in an electronic exchange system network, comprising:
>
> > **receiving market price information for a first traded item [option];**

> **automatically calculating a transaction price for the first traded item [option]** based on price information for a second traded item related to the first traded item [option];
>
> **comparing** the received market price information for the first traded item [option] to the transaction price for the first traded item [option]; and
>
> **automatically generating a request for market transaction** for one of the first traded item [option] and the second traded item **based on the comparison** of the received market price information to the transaction price.

(emphasis added.)[5]

### F. Wolverine engaged in infringing price taking activities when it engaged in the five trades cited in the Amended Complaint.

The five trades cited in the Amended Complaint are akin to the infringement example in section III(E) above. The five trades in the Amended Complaint are examples of opportunistic **price taking** activities covered by the patents:

> 96. **Wolverine Trading's trading computers**, when enabled, receive market price information for options contracts from the CBOE and automatically submit buy and/or sell orders for options contracts based on at least the received market price information in a speedy and automated fashion. For example, Wolverine Trading entered into five separate transactions for options contracts with account acronym GRF on January 27, 2009. Each of the five transactions was executed within less than approximately 467 milliseconds of **changing a bid or ask price for an options contract to a desirable price** on the CBOE. One of the five transactions was executed within less than approximately 41 milliseconds. The speed at which the **changes in price were detected by Wolverine Trading**, and the speed of the transactions executed, exclude human intervention. The average length of a blink of an eye, for example, is 300 to 400 milliseconds. *See* http://en.wikipedia.org/wiki/Blink (visited November 29, 2009).

(D.E. 74) (emphasis added.) Wolverine rapidly reacted to changes in posted bid or ask prices and acted as a **price taker** in each of the five trades cited in the Amended Complaint. In doing so,

---

[5] The patents also contain claims directed to automated hedging technology and safety logic technology.

Wolverine infringed one or more claims of the patent-in-suit.[6] The trades in the Amended Complaint, as Judge Norgle found, are "specific examples of Wolverine's commercial transactions involving plausible patent infringement." (D.E. 134 at 2.) They demonstrate infringement, not noninfringement.

**IV. WOLVERINE HAS VIOLATED ITS LPR 2.1(b) DISCLOSURE OBLIGATIONS.**

Wolverine must comply with its obligations under LPR 2.1(b)(1) by producing documents "sufficient to show the operation and construction of all aspects or elements" of those trading systems, including documents relating to the systems' architecture, programming, and functions, such as system schematics, CAD drawings, system design documents, system component data sheets/books, service or user manuals, software design documents, and functional descriptions of the system and software.[7] There is no dispute that Wolverine has failed to produce any of these documents.

Wolverine's newly advanced argument that it is relieved of producing system documents because Edge has not specifically identified the accused trading systems is without merit. First, it comes too late. Wolverine never previously raised the argument when the parties met and conferred. Wolverine's sole articulated argument for refusing to produce system-related documents, after almost agreeing to produce them, was that it concluded that it did not infringe the patents. Not once did Wolverine ever claim during the meet-and-confer process that Edge's patent infringement allegations excluded the systems that Wolverine used to engage in the five trades cited in the Amended Complaint.

---

[6] Edge alleges that Wolverine infringes either or both of the patents because the claims in '833 patent cover live calculations while claims in the '629 patent include data reference logic and because, as explained in paragraph 98 of the Amended Complaint, "The five transactions further show that Wolverine Trading's trading computers contain (1) calculators that compute transaction values for derivatives in real-time and/or (2) data reference logic that outputs transaction values for derivatives from data structures storing precalculated transaction values. However, because the details of Wolverine Trading's trading systems' architecture, programming, and functions are **kept confidential and secret from the public**, Edge cannot know whether Wolverine Trading includes one or both of the elements in its systems without the benefit of discovery." (D.E. 74 at ¶ 98) (emphasis added.)

[7] In the interest of narrowing the scope of documents to be produced under LPR 2.1(b)(1), Edge offered to drop its demand for the production of software and source code in the initial disclosure phase.

Wolverine, in fact, conceded in its response brief that the pleaded Accused Instrumentalities include the cited trading activity and the systems that engaged in those trades: "Edge identified five specific trades that Wolverine had made, and alleged that these five trades gave it the basis to assert the trades **and the systems that had made them** infringed one of the two asserted patents." (D.E. 209 at 4) (emphasis added.) After failing to raise the argument previously, and after conceding that the scope of Accused Instrumentalities covers Wolverine's trading systems, it is simply too late for Wolverine to now argue, at the last minute, that Wolverine's systems are not specifically accused of infringement.

Second, the Amended Complaint makes clear that the trading systems that Wolverine used to engage in the five trades cited in the Amended Complaint are Accused Instrumentalities.

94. On information and belief, Wolverine Trading has **trading computers** that are communicatively linked to the CBOE's exchange servers.

95. On information and belief, Wolverine Trading has **network equipment** at the CBOE that connects Wolverine Trading's **trading computers** to CBOE's exchange servers.

96. **Wolverine Trading's trading computers**, when enabled, receive market price information for options contracts from the CBOE and automatically submit buy and/or sell orders for options contracts based on at least the received market price information in a speedy and automated fashion. For example, Wolverine Trading entered into five separate transactions for options contracts with account acronym GRF on January 27, 2009. Each of the five transactions was executed within less than approximately 467 milliseconds of changing a bid or ask price for an options contract to a desirable price on the CBOE. One of the five transactions was executed within less than approximately 41 milliseconds. The speed at which the changes in price were detected by Wolverine Trading, and the speed of the transactions executed, exclude human intervention. The average length of a blink of an eye, for example, is 300 to 400 milliseconds. *See* http://en.wikipedia.org/wiki/Blink (visited November 29, 2009).

97. The five transactions identified in the preceding paragraph logically demonstrate that Wolverine Trading's **trading computers** have receiver interfaces for receiving market price information, decision logic for making buy and/or sell decisions for options contracts, and output interfaces for submitting buy and/or sell orders for option contracts.

98. The five transactions further show that Wolverine Trading's **trading computers** contain (1) calculators that compute transaction values for

> derivatives in real-time and/or (2) data reference logic that outputs transaction values for derivatives from data structures storing pre-calculated transaction values. However, because the details of Wolverine Trading's trading systems' architecture, programming, and functions are kept confidential and secret from the public, Edge cannot know whether Wolverine Trading includes one or both of the elements in its systems without the benefit of discovery.

(D.E. 74) (emphasis added.) Edge further specifically listed the patent claims that it was presently asserting against Wolverine; those claims include both system and method claims, removing any doubt that Wolverine's trading systems are Accused Instrumentalities. (*See* D.E. 74, ¶¶ 126-36.) Wolverine is further able to identify the trading systems that engaged in the trades cited in the Amended Complaint. Tellingly, Wolverine has not denied this fact.

The five trades cited in the Amended Complaint and the systems that engaged in those trades are the Accused Instrumentalities pleaded with specificity. Wolverine must comply with its obligations under LPR 2.1(b)(1) by producing documents "sufficient to show the operation and construction of all aspects or elements" of those trading systems.[8]

## CONCLUSION

For all of the above reasons and the reasons presented in the opening brief, Edge's motion to compel should be granted in its entirety.

---

[8] Wolverine makes hay about Edge's obligations to conduct a Rule 11 investigation and its ability to produce initial infringement contentions before Wolverine complies with its obligations to produce documents "sufficient to show the operation and construction of all aspects or elements" of the accused trading systems. Wolverine's argument is a red herring. Edge conducted an adequate Rule 11 investigation based on information that Edge could obtain about Wolverine's trading systems and activities, and in addition executed at least five transactions, as alleged in the Amended Complaint, that demonstrate infringement. **But Wolverine keeps the details and inner workings of its systems and activities secret, confidential, and hidden from the public.** Much of the information Edge was able to obtain is already cited in the Amended Complaint to apprise Wolverine of the Accused Instrumentalities, as names or other identifiers are not publicly available. If it must, Edge can prepare initial infringement contentions based on the information it has been able to gather. But, in this case, Wolverine is first obligated to produce its confidential information regarding the "operation and construction" of the accused systems; such disclosures will aid in preparing more meaningful initial infringement contentions so that the parties can narrow the issues in the case.

The fact remains that Wolverine has violated its initial disclosure obligations, and that is the issue before the Court. Wolverine's inappropriate conduct should not be rewarded by denying Edge documents it is entitled to review and consider prior to preparing its LPR 2.2 Initial Infringement Contentions.

Dated: Aug. 5, 2011

By:   /s/ Sang Young A. Brodie
    Ronald J. Schutz (*pro hac* vice)
    Munir R. Meghjee (*pro hac* vice)
    Sang Young A. Brodie (*pro hac* vice)
    Glenna L. Gilbert (ARDC No. 6286244)
    Miles A. Finn (*pro hac* vice)
    Seth A. Nielsen (*pro hac* vice)
    **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
    800 LaSalle Avenue, Suite 2800
    Minneapolis, MN 55402
    Telephone: (612) 349-8500

    Patrick G. Burns (ARDC No. 3122589)
    **GREER, BURNS & CRAIN, LTD.**
    300 South Wacker Drive, Suite 2500
    Chicago, Illinois 60606
    Telephone: (312) 360-0080

    **ATTORNEYS FOR PLAINTIFFS**
    **EDGE CAPTURE L.L.C. AND EDGE**
    **SPECIALISTS, L.L.C.**

**CERTIFICATE OF SERVICE**

    The undersigned attorney hereby certifies that on August 5, 2011, he caused a true and correct copy of **REPLY IN SUPPORT OF PLAINTIFFS EDGE CAPTURE L.L.C.'S AND EDGE SPECIALISTS, L.L.C.'S MOTION TO COMPEL THE WOLVERINE DEFENDANTS TO COMPLY WITH LOCAL PATENT RULE 2.1(b)(1) (D.E. 197)** to be served via electronic mail on the following attorneys of record in this case:

| | |
|---|---|
| Jeffrey G. Randall | jeffrandall@paulhastings.com |
| Allan M. Soobert | allansoobert@paulhastings.com |
| Jeffrey D. Comeau | jeffreycomeau@paulhastings.com |
| Emily Newhouse Dillingham | emilydillingham@paulhastings.com |
| Robert W. Unikel | robert.unikel@kayescholer.com |
| Deanna L. Keysor | deanna.keysor@kayescholer.com |
| Michelle Kristina Marek | michelle.marek@kayescholer.com |

/s/ Patrick G. Burns
Patrick G. Burns